SHARON CREECH AND TRAVIS CREECH, GUARDIANS AD LITEM OF JUSTIN CREECH, MINOR v. EVELYN H. MELNIK, M.D.

No. 539A96

(Filed 6 February 1998)

**1. Cancellation and Rescission of Instruments §§ 10, 11 (NCI4th); Contracts § 47 (NCI4th)— implied contract not to sue—avoidance—mutual mistake—unilateral mistake caused by other party**

In a medical malpractice action against defendant pediatrician based on her alleged failure to properly care for a newborn child during the two hours following his transfer to the intensive

CREECH v. MELNIK

[347 N.C. 520 (1998)]

care nursery immediately after his birth, the trial court erred by entering summary judgment for defendant based on her defense of an implied contract not to sue her since the jury could find that any contract not to sue was avoided by a mutual mistake of fact where the parties forecast evidence from which a reasonable jury could find that plaintiffs' attorney's disinterest in defendant as a party-defendant was the result of his reliance on her repeated representations denying her involvement in the child's care during the crucial period following his birth, and that defendant's representations were false but were the result of an honest mistake on her part caused by a lapse of memory due to the large number of children she treated on a daily basis at the hospital. Furthermore, the jury could also find that any implied contract not to sue was avoided on the ground that defendant had reason to know that plaintiffs' attorney's belief that defendant was not involved was a mistake or that she caused that mistake where the evidence forecast by the parties would permit the jury to find that defendant knew that she treated the child at the critical time in question but falsely assured plaintiffs' attorney to the contrary.

## 2. Estoppel § 18 (NCI4th)— equitable estoppel—knowingly creating false impression—absence of clean hands

In a medical malpractice action against defendant pediatrician based on her alleged failure to properly care for a newborn child during the two hours following his transfer to the intensive care nursery immediately following his birth, the trial court erred by entering summary judgment for defendant on the ground of equitable estoppel where the evidence forecast by the parties would permit the jury reasonably to find that plaintiffs' attorney's assurances to defendant that he had no reason to consider her a potential defendant were premised upon her lack of involvement in the child's care and that defendant knew or should have known that her denials of involvement had created a false impression in the attorney's mind and that she had caused and encouraged it by reassuring him that she played no role in the child's care. The doctrine of equitable estoppel could not be applied in defendant's favor if the jury finds that defendant knowingly misrepresented her involvement and knew that plaintiffs' attorney relied on this misrepresentation in making his assurances to her.

Appeal of right by plaintiffs pursuant to N.C.G.S. § 7A-30(2) from a decision of a divided panel of the Court of Appeals, 124 N.C. App.

502, 477 S.E.2d 680 (1996), affirming the order of summary judgment for defendant entered by Gore, J., on 8 June 1995 in Superior Court, Columbus County. Heard in the Supreme Court 13 October 1997.

*Wade E. Byrd for plaintiff-appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Samuel G. Thompson, William H. Moss, and James Y. Kerr, II, for defendant-appellee.*

MITCHELL, Chief Justice.

The questions presented for review are whether the Court of Appeals erred in affirming the trial court's order for summary judgment in favor of defendant on the grounds of breach of implied contract and equitable estoppel. Since we find there are genuine issues of material fact as to both issues, we reverse the decision of the Court of Appeals.

The parties agree that plaintiffs' minor son, Justin Creech, was born at Southeastern General Hospital in Lumberton on 23 September 1980. At birth, Justin's vital signs were not stable, and he was transferred to the intensive care nursery. As a result of oxygen deprivation, Justin suffers from brain damage, blindness, quadriplegia, cerebral palsy, profound mental retardation, and microcephaly.

Although the forecasts of evidence of the parties are in conflict on many points, they forecast substantial evidence from which a jury could find, but would not be required to find, the following facts. Defendant, Dr. Evelyn H. Melnik, is a neonatologist, a pediatrician specializing in the care of newborn infants. When Justin was born on 23 September 1980, Dr. Melnik was the director of newborn nurseries at Southeastern General Hospital. Because Justin's vital signs were not stable at the time of his birth, Dr. Melnik was called to resuscitate him. Justin was then transferred to the intensive care nursery. Plaintiffs concede that Dr. Melnik's resuscitation of Justin was not a cause of his injuries. Plaintiffs claim, however, that Dr. Melnik failed to care for Justin properly for approximately two hours—2:30 p.m. to 4:30 p.m. on 23 September 1980—following Justin's admission to the intensive care nursery. Plaintiffs allege that this failure resulted in Justin's condition significantly worsening.

In his initial investigation of the events surrounding Justin's birth and immediate aftercare, plaintiffs' attorney, Mr. W. Paul Pulley, focused on obstetrical negligence in the delivery room. He obtained

hospital records that were unclear in several respects concerning the circumstances surrounding Justin's birth. The records did indicate, however, that Dr. Melnik had been present during Justin's birth. Because Dr. Melnik had not participated in the obstetrical care that was the subject of Mr. Pulley's investigation but had been in the delivery room and resuscitated Justin, Mr. Pulley contacted Dr. Melnik by telephone to determine what she could remember about the circumstances of Justin's birth. Mr. Pulley told Dr. Melnik that he was investigating the circumstances of Justin's birth and was interested in the role performed by Linda May, a nurse-midwife who, according to hospital records, had performed the delivery. Mr. Pulley asked Dr. Melnik if she would help him understand the records. She agreed to meet with Mr. Pulley and asked him to bring the records with him. Thereafter, Mr. Pulley met with Dr. Melnik at her office. He went over the medical records with her and asked her questions about the typical role of a nurse-midwife. During that meeting, he told Dr. Melnik that his focus was upon the obstetrical care in the case and that he had no reason to consider her as a potential defendant.

During her initial meeting with Mr. Pulley, Dr. Melnik reviewed the medical records he had brought and made statements to the effect that negligent pediatric care during the hours immediately following Justin's birth could have contributed to his condition. In particular, she noted that no tests of blood gases had been taken until 7:00 p.m. As a result, Justin did not receive enough oxygen, which caused him to suffer from neonatal asphyxia. To that point, Mr. Pulley had regarded Dr. Melnik as a possible eyewitness to obstetrical negligence, but her comments during this initial meeting caused him to expand the scope of his inquiry to include pediatric records.

During their initial meeting, Dr. Melnik told Mr. Pulley that she had had nothing to do with Justin's care on 23 September 1980 following her resuscitation of him in the delivery room. She stated that Dr. Edmund Coley had provided Justin's pediatric care until the day after his birth, when she became involved. The medical records in Mr. Pulley's possession tended to support her statement, as the only record in his possession showing that she had been in the nursery was dated 24 September 1980, the day after Justin's birth. Dr. Melnik also stated that had she been treating Justin, she would have ordered tests of blood gases, which probably would have resulted in his receiving a higher concentration of oxygen. She stated that Dr. Coley probably had not done this because he had not seen Justin and had not realized his condition. Dr. Melnik sent Mr. Pulley a bill in the

amount of $450.00 for three hours' consultation time as a result of their first meeting, which was paid in full.

As a result of his meeting with Dr. Melnik, Mr. Pulley reexamined the medical records, which revealed that Dr. Coley had signed the pediatric records immediately after delivery. Based on the records and Dr. Melnik's statement that the pediatric care had been inadequate, Mr. Pulley brought a suit on behalf of plaintiffs against Dr. Coley and others, alleging that Dr. Coley had failed to provide Justin with proper pediatric care from the time immediately following his birth until approximately 7:30 p.m. Because Dr. Melnik had said she had nothing to do with Justin's care during that critical period of time, Mr. Pulley did not consider joining her as a defendant in that lawsuit.

In his answers to interrogatories in plaintiffs' action against him, Dr. Coley stated that on 23 September 1980, the date of Justin's birth, Dr. Melnik had undertaken Justin's pediatric care from the time of his delivery until 4:30 p.m. At that time, Dr. Coley assumed responsibility until Dr. Melnik took over Justin's primary care. In light of Dr. Coley's contradiction of Dr. Melnik's earlier statement that she had not been involved in Justin's post-delivery pediatric care on 23 September 1980, Mr. Pulley called her to ask her reaction. She continued to state that Dr. Coley had been in charge of Justin's care from the time of his delivery until 4:30 p.m. and that she had not been involved. Mr. Pulley continued to believe her statements and to seek evidence that Dr. Coley had been involved in Justin's care during the hours immediately following his birth. During a later conversation, Dr. Melnik asked Mr. Pulley whether she was a potential defendant. Mr. Pulley responded that she had told him that she had not had anything to do with Justin's care in the hours after his birth, and "I don't know of any reason we can be suing you."

Sometime later, Thelma Jean Reeves, a nurse at Southeastern General Hospital, gave a deposition in which she testified that in those instances where Dr. Melnik had been present at the delivery of a child who needed medical attention, it had been Dr. Melnik's customary practice to follow the child into the nursery. Ms. Reeves further testified that, although Dr. Coley's signature was on an order written at 2:30 p.m. on 23 September 1980, Dr. Melnik could have given the order orally, with Dr. Coley having signed it at some time after 4:30 p.m. Following Ms. Reeves' deposition, Mr. Pulley contacted Dr. Melnik and told her the substance of Ms. Reeves' testimony. At that time, he advised Dr. Melnik that she had potential mal-

practice exposure and recommended that she notify her malpractice carrier and retain an attorney. Thereafter, he sent her a copy of Ms. Reeves' deposition.

A few weeks later, Dr. Melnik's deposition was taken. Her testimony was consistent with the statements she had given Mr. Pulley since their first meeting. She continued to deny any responsibility for Justin's care between 2:30 p.m. and 4:30 p.m. on 23 September 1980. She also indicated that Justin had been taken off oxygen support at 2:45 p.m. without blood gases having been taken and that this was contrary to sound medical practice. She stated that had adequate ventilator support been provided at 2:30 p.m., it would have improved Justin's condition.

Dr. Coley was deposed and denied any involvement in Justin's care before 4:20 p.m. on 23 September 1980. He said that although his signature was on an order written at 2:30 p.m., he had merely countersigned the order, which appeared to have originated in the delivery room. Dr. Coley testified that Dr. Melnik had been in charge of Justin's care from 2:30 p.m. until 4:30 p.m. He also testified that he had found an order in the records of another child in the nursery that had been signed by Dr. Melnik at 3:25 p.m. on 23 September 1980, which tended to confirm her presence in the nursery during the critical period in Justin's care.

In light of Dr. Coley's testimony and other evidence, plaintiffs moved to amend their complaint in the action against Dr. Coley to add Dr. Melnik as a party-defendant. That motion was denied, and the case against Dr. Coley and others was eventually settled.

We repeat that the foregoing is a statement of facts that a jury could reasonably find from the evidence forecast by the parties. We reemphasize, however, that a jury would not be required to make such findings and that, in many instances, substantial evidence to the contrary was also forecast.

Plaintiffs subsequently commenced the present action against Dr. Melnik on 12 October 1990. Dr. Melnik then filed her answer raising numerous defenses, including breach of an implied contract not to sue and equitable estoppel. Both of these defenses were based on her contention that Mr. Pulley had promised that plaintiffs would not sue her. On 18 November 1994, Dr. Melnik filed a motion for summary judgment. By order entered on 8 June 1995, the trial court granted summary judgment in favor of defendant, Dr. Melnik, based on two of

her defenses—breach of an implied contract not to sue and equitable estoppel. The Court of Appeals, with Judge Johnson dissenting, affirmed the order of the trial court.

Plaintiffs contend that the Court of Appeals erred in affirming the trial court's order entering summary judgment for defendant on each of the affirmative defenses because the parties' forecasts of evidence raised a genuine issue of material fact as to each defense. We agree.

The party moving for summary judgment is entitled to judgment as a matter of law only when there is no genuine issue of material fact. *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972). The party moving for summary judgment bears the burden of bringing forth a forecast of evidence which tends to establish that there is no triable issue of material fact. *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975). To overcome a motion for summary judgment, the nonmoving party must then "produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a *prima facie* case at trial." *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989).

Before summary judgment may be entered, it must be clearly established by the record before the trial court that there is a lack of any triable issue of fact. *Page v. Sloan*, 281 N.C. 697, 704, 190 S.E.2d 189, 193 (1972). In making this determination, the evidence forecast by the party against whom summary judgment is contemplated is to be indulgently regarded, while that of the party to benefit from summary judgment must be carefully scrutinized. *Id.* Further, any doubt as to the existence of an issue of triable fact must be resolved in favor of the party against whom summary judgment is contemplated.

## I. Breach of Contract

[1] Plaintiffs first argue that the trial court erroneously entered summary judgment in favor of defendant based on her defense of an implied contract not to sue her. This Court has noted that a contract implied in fact arises where the intent of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts. *Snyder v. Freeman*, 300 N.C. 204, 217, 266 S.E.2d 593, 602 (1980). Such an implied contract is as valid and enforceable as an express contract. *Id.* Except for the method of proving the fact of mutual assent, there is no difference in the legal

effect of express contracts and contracts implied in fact. *Id.* "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." *Id.* It is essential to the formation of any contract that there be "mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds." *Id.* at 218, 266 S.E.2d at 602. Mutual assent is normally established by an offer by one party and an acceptance by the other, which offer and acceptance are essential elements of a contract. *Id.* With regard to contracts implied in fact, however, "one looks not to some express agreement, but to the actions of the parties showing an implied offer and acceptance." *Id.*

An implied contract, like any other contract, is "subject to avoidance by a showing that its execution resulted from fraud or mutual mistake of fact." *Cunningham v. Brown*, 51 N.C. App. 264, 269, 276 S.E.2d 718, 723 (1981). "This rule of contract law is founded on the proposition that there can be no contract without a meeting of the minds. . . ." *Id.* at 270, 276 S.E.2d at 723. In circumstances where there is mutual mistake, the requisite "meeting of the minds" does not occur. *Cheek v. Southern Ry. Co.*, 214 N.C. 152, 156, 198 S.E. 626, 628 (1938). When there has been no meeting of the minds on the essentials of an agreement, no contract results. *Id.* Therefore, a contract may be avoided on the ground of mutual mistake of fact when there is a mutual mistake of the parties as to an existing or past fact that is material and enters into and forms the basis of the contract or is "of the essence of the agreement." *MacKay v. McIntosh*, 270 N.C. 69, 73, 153 S.E.2d 800, 804 (1967).

As previously discussed in this opinion, the parties have forecast evidence from which a reasonable jury could find that Mr. Pulley's disinterest in Dr. Melnik as a party-defendant was the result of his reliance on her repeated representations denying her involvement in Justin's care during the crucial period immediately following the child's birth. The parties also forecast evidence from which a reasonable jury could find that Dr. Melnik's representations were false but were the result of an honest mistake on her part caused by a lapse of memory due to the large number of children she treated on a daily basis at the hospital. The evidence forecast by the parties would then permit a jury also to reasonably find that the mistake was common to both parties and was material and formed the basis of any representation by Mr. Pulley that defendant, Dr. Melnik, would not be considered as a potential party-defendant. Should a jury make such findings, it would be required to find that any implied contract not to sue was

avoided on the ground of a mutual mistake of fact. Therefore, summary judgment for defendant was not proper.

The evidence forecast by the parties would also support a reasonable finding that Dr. Melnik knew that her representations that she had not been involved in Justin's care at any critical time were false and that, as a result, Mr. Pulley's mistake was a unilateral mistake. We have at times indicated that there can be no relief from a unilateral mistake. *See, e.g., Tarlton v. Keith,* 250 N.C. 298, 305, 108 S.E.2d 621, 625 (1959). More recently, however, we have pointed out that the requirement that the mistake be mutual is not without exceptions. *Marriott Fin. Servs., Inc. v. Capitol Funds, Inc.,* 288 N.C. 122, 136, 217 S.E.2d 551, 560 (1975). "The mistake of one party is sufficient to avoid a contract when the other party had reason to know of the mistake or caused the mistake." *Howell v. Waters,* 82 N.C. App. 481, 487-88, 347 S.E.2d 65, 69 (1986), *disc. rev. denied,* 318 N.C. 694, 351 S.E.2d 747 (1987). If a jury should find from the substantial evidence forecast by the parties that Dr. Melnik knew she had treated Justin at the critical time in question but had falsely assured Mr. Pulley to the contrary, the jury could also find that she had reason to know that his belief that she was not involved was a mistake or that she caused that mistake. In that event, any implied contract not to sue her would be avoided. For this reason also, summary judgment for defendant on the ground of an implied contract not to sue was improper.

## II. Equitable Estoppel

**[2]** Plaintiffs next contend that the trial court erroneously entered summary judgment in favor of defendant on the ground of equitable estoppel. For the reasons discussed herein, we conclude that the parties have forecast evidence raising genuine issues of material fact as to whether the doctrine of equitable estoppel may be applied in favor of defendant in this case.

Where there is but one inference that can be drawn from the undisputed facts of a case, the doctrine of equitable estoppel is to be applied by the court. *Hawkins v. M&J Fin. Corp.,* 238 N.C. 174, 185, 77 S.E.2d 669, 677 (1953). However, in a case such as this, where the evidence raises a permissible inference that the elements of equitable estoppel are present, but where other inferences may be drawn from contrary evidence, estoppel is a question of fact for the jury, upon proper instructions from the trial court. *Meachan v. Montgomery County Bd. of Educ.,* 47 N.C. App. 271, 278, 267 S.E.2d 349, 353 (1980).

**CREECH v. MELNIK**

[347 N.C. 520 (1998)]

One who seeks equity must do equity. *Gaston-Lincoln Transit, Inc. v. Maryland Cas. Co.*, 285 N.C. 541, 546-47, 206 S.E.2d 155, 159 (1974). The fundamental maxim, "He who comes into equity must come with clean hands," is a well-established foundation principle upon which the equity powers of the courts of North Carolina rest. The maxim applies to the conduct of a party with regard to the specific matter before the court as to which the party seeks equitable relief and does not extend to that party's general character. *See Tobacco Growers Co-op. Ass'n v. Bland*, 187 N.C. 356, 360, 121 S.E. 636, 638 (1924). The conduct of both parties must be weighed in the balance of equity, and the party claiming estoppel, no less than the party sought to be estopped, must have conformed to strict standards of equity with regard to the matter at issue. *In re Will of Covington*, 252 N.C. 546, 549, 114 S.E.2d 257, 260 (1960) (quoting *Hawkins*, 238 N.C. at 177, 77 S.E.2d at 672).

From the evidence forecast by the parties, a jury could reasonably find that defendant knew Mr. Pulley's assurances to her were premised upon her lack of involvement in Justin's care. The evidence as forecast by the parties would also support a reasonable jury finding that defendant knew or should have known that her denials of involvement had created a false impression in Mr. Pulley's mind and that she had caused and encouraged it by reassuring him that she played no role in Justin's care. Since the parties have forecast evidence that would permit a jury to conclude that defendant knowingly misrepresented her involvement and knew that Mr. Pulley relied on this misrepresentation in making his assurances to her, then a jury could also find that defendant is not entitled to the protection afforded by the doctrine of equitable estoppel. Should a jury find that defendant knowingly created such a false impression in Mr. Pulley's mind, the doctrine of equitable estoppel could not be applied in her favor. *See Hawkins*, 238 N.C. at 179, 77 S.E.2d at 673. Thus, the order of summary judgment for defendant based on equitable estoppel was improper.

We emphasize that our opinion in this case should in no way be taken as an expression of opinion as to what the evidence actually introduced at any future trial of this case will tend to show or the weight or credibility any such evidence should be given. Also, we have discussed only one set of facts a jury could find to exist if evidence as forecast by the parties at this summary judgment stage of the proceedings is in fact forthcoming at trial. We recognize that the evidence actually introduced at the trial of this case may well support

JOHNSON v. SOUTHERN INDUSTRIAL CONSTRUCTORS

[347 N.C. 530 (1998)]

other or contrary reasonable findings of fact by a jury. However, summary judgment is particularly inappropriate where issues such as motive, intent, and other subjective feelings and reactions are material and where the evidence is subject to conflicting interpretations. *Smith v. Currie*, 40 N.C. App. 739, 742, 253 S.E.2d 645, 647, *disc. rev. denied*, 297 N.C. 612, 257 S.E.2d 219 (1979).

For the foregoing reasons, we conclude that the trial court erred in ordering summary judgment for defendant on the grounds of an implied contract not to sue and equitable estoppel. Therefore, the decision of the Court of Appeals is reversed, and this case is remanded to the Court of Appeals for further remand to the Superior Court, Columbus County, for proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.