SCI N.C. Funeral Servs., LLC v. McEwen Ellington Funeral Servs., Inc., 2013 NCBC 11.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 558

SCI NORTH CAROLINA FUNERAL
SERVICES, LLC; CAROTHERS
HOLDING COMPANY, LLC,

        Plaintiffs,

v.

MCEWEN ELLINGTON FUNERAL
SERVICES, INC.; MCEWEN FUNERAL
HOME, INC.; MCEWEN FUNERAL
SERVICES, INC.; and CARL M.
ELLINGTON, JR.,

        Defendants.

**ORDER AND OPINION**

*Moore & Van Allen, PLLC by Anthony T. Lathrop and J. Mark Wilson for Plaintiffs.*

*Devore, Acton & Stafford, P.A. by Fred W. DeVore, III and Troy Stafford and Womble Carlyle Sandridge & Rice, LLP by James P. Cooney, III for Defendants.*

Murphy, Judge.

{1}   THIS MATTER is before the Court on Plaintiffs' Motion for Preliminary Injunction (the "Motion"). After considering the Motion, the parties' briefs in support and opposition, and counsels' arguments made during a hearing on the Motion on February 1, 2013, the Court GRANTS Plaintiffs' Motion finding as follows:

I.

PROCEDURAL HISTORY

{2}   Plaintiffs filed their Verified Complaint on January 11, 2013, alleging claims for common law trademark infringement and unfair and deceptive trade practices. Plaintiffs also filed, contemporaneously with their Complaint, a Notice of Designation of Action as a Mandatory Complex Business Case. The case was subsequently designated as a mandatory complex business case by the Chief Justice

of the North Carolina Supreme Court, and assigned by the Chief Special Superior Court Judge for Complex Business Cases to this Court.

{3} The same day Plaintiffs filed their Compliant, they also filed a Motion for Temporary Restraining Order ("TRO") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure, and a Memorandum in Support. The Court held a hearing on Plaintiffs' Motion for TRO on January 11, 2013, at which all parties were represented by counsel, and an order granting Plaintiffs' Motion for TRO was issued that same day.

{4} The terms of the TRO enjoined Defendants from "any and all activities that are likely to cause confusion with Plaintiffs' rights in the [*McEwen* name], including using, in advertising, marketing, or promotion, or as any part of the name of a funeral services business in the greater Charlotte area, the [*McEwen* name]." *SCI North Carolina Funeral Servs., Inc. v. McEwen Ellington Funeral Servs., Inc.*, 13 CVS 558 at 5–6 (N.C. Super. Ct. Jan. 11, 2013) (order granting TRO). Specifically, Defendants were prohibited "from using the names *McEwen Ellington Funeral Services*, *McEwen Funeral Home, Inc.*, *McEwen Funeral Services, Inc.*, or any other similar mark, word, name, symbol, or slogan that incorporates the [*McEwen* name] or is likely to cause confusion with the [*McEwen* name]." *Id.* at 6.

{5} Under the terms of the TRO, the Court scheduled a hearing for January 17, 2013, to determine whether Defendants should be preliminarily enjoined from using the *McEwen* name. However, during a Case Management Conference on January 16, 2013, the parties consented to an extension of the TRO, and to reschedule the hearing on Plaintiffs' Motion until February 1, 2013. *SCI North Carolina Funeral Servs., Inc. v. McEwen Ellington Funeral Servs., Inc.*, 13 CVS 558 at 1 (N.C. Super. Ct. Jan. 23, 2013) (order granting first extension of TRO). At the end of the February 1, 2013, hearing, Plaintiffs moved for the TRO to be extended for an additional ten (10) days, and Defendants consented. *SCI North Carolina Funeral Servs., Inc. v. McEwen Ellington Funeral Servs., Inc.*, 13 CVS 558 at 1 (N.C. Super. Ct. Feb. 1, 2013) (order granting second extension of TRO). On February 8, 2013, the Court requested the parties' positions on another extension of the TRO for an

additional five (5) days to give the Court adequate time to consider the matter. All parties consented to the Court's request for a third extension. *SCI North Carolina Funeral Servs., Inc. v. McEwen Ellington Funeral Servs., Inc.*, 13 CVS 558 at 1 (N.C. Super. Ct. Feb. 8, 2013) (order granting third extension of TRO).

## II.

## FACTUAL BACKGROUND

{6} "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance . . . ." N.C. R. Civ. P. 65(d). However, findings of fact and conclusions of law made when ruling on motions for injunctive relief are not binding on a court when evaluating subsequent dispositive motions or the merits of the action in an eventual trial. *Windsor Jewelers, Inc. v. Windsor Fine Jewelers, LLC*, 08 CVS 24643 (N.C. Super. Ct. May 22, 2009) (order denying a motion to dismiss that argued that defendants were entitled to a dismissal because the court denied plaintiffs' request for injunctive relief); *A.E.P. Indus. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (stating that "[a] preliminary injunction is interlocutory in nature, . . . [and] '[i]ts decree bears no precedent to guide the final determination of the rights of the parties.'" (quoting *State v. Fayetteville St. Christian Sch.*, 299 N.C. 351, 357–58, 261 S.E.2d 908, 913 (1980))). Accordingly, the following factual background is recited solely for the purpose of providing context for the Court's reasons underlying the injunction.

{7} Plaintiffs are North Carolina limited liability companies that own and operate a number of funeral homes offering funeral services in and around Charlotte, North Carolina. (Vr. Compl. ¶ 1.)

{8} Carl J. McEwen ("McEwen"), the founder of McEwen Funeral Services, Inc. ("MFS") (not to be confused with Defendant McEwen Funeral Services, Inc. which was only recently registered with the North Carolina Secretary of State), began servicing funeral homes in 1921. (Defs.' Mem. Opp. Mot. for Prelim. Inj. ("Defs. Mem.") 3.) By 1944, McEwen opened a location in Charlotte on Morehead Street (the location currently used by Defendants to provide funeral services), and eventually brought in other family members to help run MFS and McEwen Funeral

Home of Mint Hill ("MFS Mint Hill"). (Defs. Mem. 3.) One of the family members brought in by McEwen was Carl McEwen Ellington, Sr. ("Ellington Sr.") (McEwen's grandson) who ran the company from 1956 until 1986 when MFS and MFS Mint Hill were sold. (Defs. Mem. 3.) Defendant Carl McEwen Ellington, Jr. ("Ellington Jr.") (Ellington Sr.'s son) was a shareholder in MFS and a partner in MFS Mint Hill. (Vr. Compl. ¶ 16.)

{9} On July 24, 1986, the McEwen family, including Ellington Sr. and Ellington Jr., entered into a Capital Stock Purchase Agreement ("Stock Agreement") and Asset Purchase Agreement ("Asset Agreement") with Service Corporation International ("SCI") (not to be confused with Plaintiff SCI North Carolina Funeral Services, Inc. ("SCI NC")) for the sale of MFS's stock and MFS Mint Hill's assets. (Vr. Compl. 12.) These agreements explicitly covered the ownership and sale of MFS and MFS Mint Hill's trademarks and trade names, and provided that "[MFS] owns the common law and exclusive right to the trade name 'McEwen Funeral Service' in the trade area in which such name is utilized in the Corporation's business . . . [,]" (Aff. of Robert D. Polydys, II ("Polydys") Ex. A ("Stock Agreement") Art. III § 13), and that "[MFS Mint Hill], at the Closing . . . will sell, transfer, convey and deliver to [SCI] . . . all of the assets . . . of [MFS Mint Hill] of every type and description, . . . including, without limitation, . . . [all] trademarks, trade names (including all trade names under which the Seller does business) . . . ." (Aff. of Polydys Ex. B ("Asset Agreement") Art. I § 1.)

{10} Since the sale, the *McEwen* name has been continuously used in the ownership and operation of funeral homes throughout Charlotte, Mint Hill, Pineville, and Monroe. In addition, MFS continued to use its Charlotte location on Morehead Street until the early 2000s. (Vr. Compl. ¶ 18; Pls.' Mem. Supp. Mot. for Prelim. Inj. ("Pls. Mem.") 4.)

{11} The *McEwen* name has been promoted through sponsorship of community activities organized by "Hospice and Palliative Care of Charlotte, the Levine Children's hospital, the Knights of Columbus, the Lions Club, and a variety of other organizations and schools." (Aff. of Polydys ¶ 11.) The *McEwen* name is also

advertised in the Charlotte region through television, radio, and print media that costs tens-of-thousands-of-dollars per year. (Aff. of Polydys ¶¶ 12–14.)

{12} Plaintiffs have not registered the *McEwen* name under either the North Carolina Trademark Registration Act or the federal Trademark Act of 1946. (Defs.' Mem. 2.)

{13} Despite being a former shareholder in MFS and partner in MFS Mint Hill, recently, Ellington Jr. registered a funeral home with the North Carolina Board of Funeral Service under the trade name *McEwen Ellington Funeral Services* (Vr. Compl. ¶ 19), and registered the following corporations with the North Carolina Secretary of State: *McEwen Ellington Funeral Services, Inc.*; *McEwen Funeral Home, Inc.*; *and McEwen Funeral Services, Inc.* (Vr. Compl. ¶ 20.)

{14}    Defendants have begun funeral home operations at the Morehead Street location previously used by Plaintiffs, erected a sign on the site using the name *McEwen Ellington Funeral Services*, and, according to Plaintiffs, contracted for advertising to be run under the *McEwen Ellington Funeral Services* name in the January 12–13, 2013, weekend edition of the Charlotte Observer. (Pls.' Mem. 4; Vr. Compl. ¶ 24.)

{15} Plaintiffs also allege that the script used in the signage advertising Defendants' Morehead Street location is "similar to the script used on the [MFS] sign [that had been used] at this location until the early 2000s" (Aff. of Polydys ¶ 15); that Defendants "have decorated the lobby of [the Morehead Street location] with the same painting of Carl J. McEwen that is in the lobby of [MFS] at Sharon Memorial Park and [MFS] Mint Hill Chapel" (Aff. of Polydys ¶ 18); and that while Defendant Ellington, Jr. has not customarily used his middle name (McEwen) in other business contexts, the McEwen name inexplicably began to appear when Defendants opened their competing funeral home business. (Aff. Polydys ¶¶ 20–21.)

{16} On December 7, 2012, Plaintiffs mailed Ellington Jr. a letter stating that Plaintiffs own and operate five funeral homes in North Carolina containing the name *McEwen* and advised Ellington Jr. that he should withdraw his registration of the marks listed above. (Pls.' Mem. 5.)

{17} To demonstrate that a likelihood of confusion between the parties' trade names exists, Plaintiffs allege that the following examples of "actual confusion" have already occurred: (1) that on the week of January 7, 2013, mail for *McEwen Ellington Funeral Services* was mistakenly delivered to MFS's Mint Hill Chapel location; (2) that on January 14, 2013, flowers intended of a funeral service to be performed by *McEwen Ellington Funeral Services* were delivered by mistake to MFS's Sharon Memorial Park location; and (3) that on January 14, 2013, one of MFS's managers was asked by a customer if a funeral service could be held at *McEwen Ellington Funeral Services'* new facility.  (Aff. of Polydys ¶ 23.)

## III.
## PRINCIPLES OF LAW

### A.
### PRELIMINARY INJUNCTION STANDARD

{18} The purpose of a preliminary injunction is "'to preserve the [status quo] pending trial on the merits.'"  *A.E.P. Indus., Inc.*, 308 N.C. at 401, 302 S.E.2d at 759 (quoting *State v. Fayetteville St. Christian Sch.*, 299 N.C. at 357, 261 S.E.2d at 913).  The remedy of a preliminary injunction "'is an extraordinary measure[,] . . . [and] will be issued only (1) if a plaintiff is able to show *likelihood* of success on the merits of [its] case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued . . . .'"  *Id.* (quoting *Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977)).

### B.
### COMMON LAW TRADEMARK INFRINGEMENT THROUGH THE USE OF SURNAMES

{19} "A man has the right to use his own name in connection with his business, provided he does so honestly and does not resort to unfair methods by which he wrongfully encroaches upon another's rights or commits a fraud upon the public." *Zagier v. Zagier*, 167 N.C. 616, 617, 83 S.E. 913, 913 (1914) (citing *Bingham Sch. v. Gray*, 122 N.C. 699, 707, 30 S.E. 304, 304 (1898)).  Accordingly, "[a]s a rule, a trademark can not be taken in a surname . . . ."  *Bingham Sch.*, 122 N.C. at 707, 30 S.E.

at 305 (citing *Brown Chem. Co. v. Meyer,* 139 U.S. 540 (1891)); *accord Zagier*, 167

N.C. at 617, 83 S.E. at 913 (stating that "[a]s a rule, a trade-mark cannot be taken

in a surname . . . .").[1]

{20} That a plaintiff is incorporated using its founder's surname

> does not give it the exclusive right to that name; another corporation might be created by and operated under the same title, when not in the same locality, in the absence of proof of an intent to injure the first named corporation or to avail itself fraudulently of the other's good name and reputation.

*Bingham Sch.,* 122 N.C. at 707, 30 S.E. 304–05.

{21} As a result,

> 'any one [sic] having the same surname as that under which a business has been long and successfully conducted by another, so as to acquire a reputation therefor [sic], can conduct a like business under the same name, provided there be no intent to injure or fraudulently attract the benefit of the good name and reputation previously acquired by the other.'

*Zagier*, 167 N.C. at 617, 83 S.E. at 913 (quoting *Bingham Sch.*, 122 N.C. 699, 30

S.E. 304 (pinpoint citation omitted because the quoted language is from Headnote 1

of the *Bingham School* opinion)). "'It is not the use, but dishonesty in the use, of the

---

[1] In support of the rule that a trademark cannot be taken in a surname, the Court in *Zaiger* cited to *Russia Cement Co. v. LePage*, where the Massachusetts Supreme Judicial Court held that

> 'A person cannot make a trade-mark of his own name, and thus debar another having the same name from using it in his business, if he does so honestly and without any intention to appropriate wrongfully the good-will of a business already established by others of the name. Every one [sic] has the absolute right to use his own name honestly in his own business for the purpose of advertising it, even though he may thereby incidentally interfere with and injure the business of another having the same name. In such case the inconvenience or loss to which those having a common right to it are subjected is *damnum absque injuria*. But although he may thus use his name, he cannot resort to any artifice or do any act calculated to mislead the public as to the identity of the business, firm, or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name.'

*Zagier*, 167 N.C. at 617–18, 83 S.E. at 913 (quoting *Russia Cement Co.*, 147 Mass. 206, 209 (Mass. 1888) (citations omitted)).

name that is condemned.'" *Zagier*, 167 N.C. at 617, 83 S.E. at 913 (quoting *Howe Scale Co. v. Wyckoff*, 198 U.S. 118 (1905) (pinpoint citation omitted because the quoted language is from the syllabus of the *Howe Scale Co.* opinion)).[2]

{22} While the use of an individual's surname is protected under the common law, "it is also well established that one may, by contract, conclude himself from the use of his own name in a given business, and the agreement will be enforced by the courts." *Zagier*, 167 N.C. at 617, 83 S.E. at 913 (citing *Ranft v. Reimers*, 200 Ill. 386 (Ill. 1902); *Frazer v. Frazer*, 121 Ill. 147 (Ill. 1887); *Russia Cement Co.*, 147 Mass. 206; *Hall Safe Lock Co. v. Herring-Hall-Marvin Safe Co.*, 143 F. 231, 237 (7th Cir. 1906)). In such situations:

> '[o]ne who has carried on a business under a trade name, and sold a particular article in such a manner, by the use of his name as a trade-mark or a trade name, as to cause the business or the article to become known or established in favor under such name, may sell or assign such trade name or trade-mark when he sells the business or manufacture, and by such sale or assignment conclude *himself* from the further use of it in a similar way.'

*Zagier*, 167 N.C. at 618 83 S.E. at 913–14 (emphasis added) (quoting *Russia Cement Co.,* 147 Mass. at 209).

{23} In addition, it is possible "'that other trademark principles, such as the doctrine of secondary meaning in connection with surnames or descriptive terms, will also be applied in cases alleging a corporate name infringement.'" *Two Way Radio Serv., Inc. v. Two Way Radio of Carolina, Inc.*, 322 N.C. 809, 816, 370 S.E.2d 408, 412 (1988) (quoting R. Robinson, *North Carolina Corporation Law and Practice* § 4-1, at 52 (3d ed. 1983)).

---

[2] The language used in the opinion in *Howe Scale Co.* states that "[i]t is dishonesty in the use that is condemned, whether in a partnership or corporate name, and not the use itself." *Howe Scale Co.*, 198 U.S. 118, 136.

## C.

## COMMON LAW PROTECTION OF GENERIC AND GENERALLY DESCRIPTIVE WORDS

{24} "At common law generic, or generally descriptive, words and phrases, as well as geographic designations, may not be appropriated by any business enterprise either as a tradename [sic] or as a trademark." *Charcoal Steak House, Inc. v. Staley*, 263 N.C. 199, 201, 139 S.E.2d 185, 187 (1964). Such words "are the common property and heritage of all who speak the English language; they are *publici juris*. If the words reasonably indicate and describe the business or the article to which they are applied, they may not be monopolized." *Id.* (citations omitted).

{25} "Although, a generic word or a geographic designation cannot become an arbitrary trademark, it may nevertheless be used deceptively by a newcomer to the field so as to amount to unfair competition . . . ." *Id.* (citing *Cleveland Opera Co. v. Cleveland Civic Opera Ass'n.*, 22 Ohio App. 400 (Oh. Ct. App. 1926)). In such situations, "the prohibition against any right to the exclusive use of such a word or designation has been modified by the 'secondary meaning' doctrine." *Charcoal Steak House, Inc.*, 263 N.C. at 201, 139 S.E.2d at 187 (citing *Surf Club v. Tatem Surf Club*, 151 Fla. 406 (Fl. 1942)).

{26} Secondary meaning is attained "[w]hen a particular business has used words *publici juris* for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise . . . ." *Charcoal Steak House, Inc.*, 263 N.C. at 201–02, 139 S.E.2d at 187.

## D.

## EFFECT OF INCORPORATION AND LICENSURE ON COMMON LAW TRADEMARK RIGHTS

{27} North Carolina law provides that:

> The filing of any document, the reservation or registration of any name under this Chapter or under Chapter 55, 55A, 55B, 57C, or 59 of the General Statutes, or the issuance of a certificate of authority to transact business or conduct affairs or a statement of foreign registration *does not authorize the use in this State of a name in violation of the rights of any third party under the federal trademark act, the trademark act of this State, or other statutory or common law, and is not a defense to an action for violation of any of those rights.*

N.C. GEN. STAT. § 55D-20(e) (2013) (emphasis added).

## IV.

## ANALYSIS

## A.

## THE PARTIES' ARGUMENTS

{28} Plaintiffs argue that they are entitled to injunctive relief because they (1) "have an exclusive right to the [*McEwen* name] for us [sic] in conjunction with funeral home services in Charlotte," (Pls. Mem. 1), and (2) "Defendants' use of the [name] on the same services and in the same territory is likely to cause confusion." (Pls. Mem. 1.)

{29} To show that Plaintiffs' have an exclusive right to the *McEwen* name, Plaintiffs argue that: (1) their exclusive right to the *McEwen* name is recognized under North Carolina's common law, (2) the "likelihood of confusion" test is the proper standard for determining whether Defendants have infringed on Plaintiffs' rights, (3) Defendants' are prevented from using the *McEwen* name because of Plaintiffs' senior status to the name even though it is part of Ellington Jr.'s name, (4) the sale of Ellington Jr.'s rights in the name prohibit his use of the name, and (5) the North Carolina Board of Funeral Service and the North Carolina Secretary of State's registration of the name does not affect Plaintiffs' common law rights.

{30} Defendants respond by arguing: (1) that Plaintiffs' senior status does not provide them with an exclusive right to use of a family name, (2) that Defendants' use of the *McEwen* name, when evaluated under the "likelihood of confusion" test, does not entitle Plaintiffs to their requested relief, and (3) that Plaintiffs are barred from equitable remedies under the doctrine of unclean hands.

B.

STANDING

{31} The Court notes that a comparison of the allegations in the Verified Complaint, with the terms of the Stock Agreement and Asset Agreement attached as exhibits to the Affidavit of Robert D. Polydys, II, results in ambiguity. While Plaintiffs allege in the Verified Complaint that "the McEwen family sold MFS to SCI" (while defining SCI as SCI NC and Plaintiff Carothers Holding Company, LLC, both North Carolina Corporations), the Stock Agreement and Asset Agreements show the purchaser was SCI, a Texas corporation. (Stock Agreement p. 1; Art. 1 § 1–2; Asset Agreement p. 1; Art. 1 § 1.)

{32} Based on a review of all the motions, memoranda in support and opposition, affidavits, and accompanying exhibits, it would appear that SCI was the purchaser of MFS rather than Plaintiffs, and that SCI purchased MFS's stock, and did not, as was done with MFS Mint Hill, purchase MFS's assets. (Stock Agreement p. 1; Art. 1 § 1–2; Asset Agreement p. 1; Art. 1 § 1.) While not raised by the parties at the hearing, or in their memoranda, Plaintiffs leave unclear how they are able to enforce rights acquired in an agreement to which they were not a party, or, assuming that Plaintiffs subsequently acquired the stock purchased by SCI, how they have standing to sue individually for the protection of rights that belong to a corporation (MFS), of which they are only shareholders. *Goldston v. State*, 361 N.C. 26, 30, 637 S.E.2d 876, 879 (2006) ("'[T]he 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" (quoting *Stanley v. Dep't of Conservation & Dev.*,

284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973))); *see also* R. Robinson, *North Carolina Corporation Law and Practice* § 17.02[1] ("The North Carolina Courts have expressly rejected the argument that a shareholder has an individual right to recover directly for any loss in the value of his shares caused by a wrong committed against the corporation." (citing *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 488 S.E.2d 215 (1997))).

{33} The Court's questions about Plaintiffs' standing do not ignore the fact that SCI also purchased the assets of MFS Mint Hill. Nevertheless, it remains unclear at this juncture how Plaintiffs acquired those assets from SCI. Absent ownership of MFS Mint Hill's assets, or at a minimum MFS Mint Hill's trade names, it would appear that Plaintiffs lack standing to sue for the protection of a trade name they do not own. (Asset Agreement p. 1; Art. 1 § 1.)

{34} While this issue was not specifically addressed by the parties, the Court notes that Plaintiffs' allege in their Verified Complaint that they own MFS, and "operate[] a number of funeral homes . . . including locations in Charlotte [and] . . . Mint Hill." (Vr. Compl. ¶¶ 12, 18.) As a result, the Court accepts, for the purposes of this Motion, that Plaintiffs acquired MFS's stock and MFS Mint Hill's assets from SCI. Accordingly, Plaintiffs may sue to protect the trade names purchased from MFS Mint Hill, but may not be authorized to bring cliams individually for infringement to trade names held by MFS.

C.

DO PLAINTIFFS HAVE AN EXCLUSIVE RIGHT TO USE THE NAME *MCEWEN* UNDER THE COMMON LAW?

1.

LEGAL STANDARD

{35} At its essence, this case concerns the use of a surname, and not simply the protection of a trademark or trade name, as argued by Plaintiffs. The North Carolina Supreme Court has stated that "[a]s a rule, a trade-mark cannot be taken in a surname . . . ." *Bingham Sch.*, 122 N.C. at 707, 30 S.E. at 305; *accord Zagier*, 167 N.C. at 617, 83 S.E. at 913. This rule means that Plaintiffs' use of the *McEwen*

name "does not give it the exclusive right to that name . . . ." *Bingham Sch.*, 122 N.C. at 707, 30 S.E. at 304. Instead, as the Court in *Bingham School* stated, other "corporation[s] might be created by and operated under the same title, when not in the same locality, in the absence of proof of an intent to injure the first named corporation or to avail itself fraudulently of the other's good name and reputation." *Id.* at 707, 30 S.E. at 304–05.

{36} The parties' argument that the Court should adopt the "likelihood of confusion" test comes from the North Carolina Supreme Court's use of the word "confusion" in its opinion in *Blackwell's Durham Tobacco Co. v. The American Tobacco Co.*, 145 N.C. 367, 59 S.E. 123 (1907). In *Blackwell's Durham Tobacco Co.*, the Court stated that "an injunction lies to restrain the simulation and use by one corporation of the name of a prior corporation, which tends to create *confusion* and to enable the latter corporation to obtain, by reason of the similarity of names, the business of the prior one." *Id.* at 374, 59 S.E. at 126 (emphasis added) (quotation omitted).

{37} *Blackwell's Durham Tobacco Co.* is distinguishable from this case, and surname cases in general, for three reasons. First, *Blackwell's Durham Tobacco Co.* did not deal with surnames, and the Supreme Court's subsequent opinion in *Zagier*, which does involve a challenge to a defendants' use of a surname, cited to the fraudulent intent standard adopted in *Bingham School*, rather than the confusion standard adopted in *Blackwell's Durham Tobacco Co. Zagier*, 167 N.C. at 617, 83 S.E. at 913.[3] The use of a separate standard for surname cases leaves this Court to conclude that the Supreme Court did not intend for the confusion standard to be applied. Second, the rule against allowing surnames to be taken as trademarks would by definition distinguish cases like *Blackwell's Durham Tobacco Co.*, that concern the protection of trademarks, from cases like *Bingham School* and *Zagier*, that are concerned with preventing "dishonesty in the use[] of the name" that

---

[3] The Court's decision not to cite to *Blackwell's Durham Tobacco Co.'s* confusion standard cannot be attributed to the fact that the plaintiff in *Zagier* was an individual rather than a corporation because the plaintiff in *Bingham School* was incorporated by the Legislature in 1864. *Bingham Sch.*, 122 N.C. at 705, 30 S.E. at 304.

*cannot* be trademarked. *Id.* at 617, 83 S.E. at 913. Third, the complaint in *Blackwell's Durham Tobacco Co.* did not allege that plaintiff's creation, and thus use of its trademark, occurred before defendants' inception. *Blackwell's Durham Tobacco Co.*, 145 N.C. at 372, 59 S.E. at 125. The Court stated that this type of allegation was important because "a trademark[] is acquired, not simply by adoption, but by using it." *Id.* at 374–75, 59 S.E. at 126. Because plaintiff failed to say when the use began it could not demonstrate that it was the senior user, and therefore had a protectable trademark. The Court's decision that plaintiff needed to allege that it was created prior to the defendant, obviated the need to discuss the confusion standard because plaintiff failed to demonstrate that it had a protectable trademark.

{38} While these facts might end the discussion, the Court also recognizes that the North Carolina Supreme Court has left open the possibility that surnames could be protectable trademarks if they have "secondary meaning" as the term is used within trademark law. *Two Way Radio Service, Inc.*, 322 N.C. at 816, 370 S.E.2d at 412 ("'It is to be expected that other trademark principles, such as the *doctrine of secondary meaning* in connection with surnames or descriptive terms, will also be applied in cases alleging a corporate name infringement.'" (emphasis added)).[4]

{39} Within the last one-hundred-and-fifteen years there has been very little case law discussing the status of North Carolina's common law as it applies to trademarks, trade names, and surnames. This may account in part for prompting the parties to apply that the "likelihood of confusion" test established in *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522 (4th Cir. 1984).[5] While the applicable case law

---

[4] The Court notes however, that the facts of *Two Way Radio Service, Inc.* did not concern a dispute over surnames, but rather, whether "two way radio" had acquired secondary meaning. The Court's reference to surnames came in its discussion of whether statutes enacted by the Legislature had superseded the common law. While the Court's discussion was necessary to determine whether the common law of trade names survived to inform the interpretation of the statutes, it would not have needed to determine whether the doctrine of "secondary meaning" applied to surname cases. Accordingly, the Court's language was likely *gratis dictum*.

[5] The Court acknowledges that it applied this test in its Order granting Plaintiffs' Motion for TRO. However, after further reflection, review of the expanded record, and

is old, the standards and legal conclusions articulated in *Bingham School* and *Zagier* have been overturned. Accordingly, the Court is unconvinced, at this point, that the application of North Carolina's common law requires the adoption of the "likelihood of confusion" test. Therefore, the Court will apply the fraudulent intent standard as established in *Bingham School* and *Zagier*, and if necessary, consider whether the *McEwen* name has attained "secondary meaning" such that it could become a protectable trademark.

2.

FRAUDULENT INTENT STANDARD

{40} Under the fraudulent intent standard adopted in *Bingham School*, when a surname is already in use in the name of a corporation, a subsequent "corporation might be created by and operated under the same [name], when not in the same locality, in the absence of proof of an intent to injure the first named corporation or to avail itself fraudulently of the other's good name and reputation." *Bingham Sch.*, 122 N.C. at 707, 30 S.E. at 304–05. This standard suggests that: (1) another corporation may be created using the same name, (2) the subsequent user may only use the same name when it is not in the same locality as the original user, and (3) there must be no evidence that the subsequent user selected the name with the intent to injure the original user or fraudulently avail itself of the original users' good name and reputation. This standard is identical to the one quoted in *Zagier* except that the requirement that a subsequent user not be in the same locality was omitted. *Zagier*, 167 N.C. at 617, 83 S.E. at 913 ("[A]ny one having the same surname as that under which a business has been long and successfully conducted by another, . . . can conduct a like business under the same name, provided there be no intent to injure or fraudulently attract the benefit of the good name and reputation previously acquired by the other.").

{41} The Court is uncertain whether this omission was intentional, so as to eliminate the locality requirement, or was a result of the fact that the ruling in

consideration of case law not previously presented to the Court, the Court concludes that the use of the 'likelihood of confusion' test may have been premature.

*Zagier* was not based on the Court finding fraudulent intent, but rather on the fact that the subsequent user had contracted with plaintiff to not operate a business with the disputed surname in a particular city. By concluding that the defendant had precluded himself from using the name because he contracted that right away, arguably *Zagier*'s conclusions are based on a theory of contract rather than on one of unfair trade practices. In addition, the parties in *Zagier* appear to have existed in the same locality.[6] *Id.* at 618, 83 S.E. at 914. Presumably then, any reliance on the fraudulent intent standard by the Court would have required a discussion of the geographic proximity of defendant's competing business to plaintiffs' operations. These distinctions lead the Court to conclude that while the opinion in *Zagier* quoted the standard from *Bingham School* it did not do so for the purpose of resolving the dispute in the case before it, or to amend the standard previously established. Accordingly, this Court will apply the test as set out in *Bingham School*.

### 3.

### MAY DEFENDANTS USE THE *MCEWEN* NAME APPLYING THE FRAUDULENT INTENT STANDARD ADOPTED IN *BINGHAM SCHOOL*?

#### a.

### IS THE SUBSEQUENT USER IN THE SAME LOCALITY AS THE ORIGINAL USER?

{42} Based on the facts alleged by Plaintiffs, the Court finds, for the purposes of this Motion, that Plaintiffs "have owned and/or operated a number of funeral homes in and around the greater Charlotte area that offer funeral services to customers using the [*McEwen* name], including locations in Charlotte . . . , Mint Hill, Pineville, and Monroe." (Vr. Compl. ¶ 18.)

---

[6] While it appears that the parties in *Zagier* operated in the same locality, this Court cannot be certain. The Court *Zagier* only notes that the defendant was prohibited under the parties' contract from operating a clothing business in Asheville. There is no discussion about the defendants' proximity to plaintiff's operations, of even if plaintiff had any operations in existence.

{43} In addition, the Court finds that Defendants "opened a funeral home business at the location on Morehead Street [in Charlotte, North Carolina] where Carl J. McEwen first established a business . . . ." (Defs.' Mem. 4.) The Court also finds that Defendants "sought to operate under the name McEwen Ellington Funeral Services." (Defs.' Mem. 4.)

{44} Under the standard established in *Bingham School*, while Defendants may operate a business under the same name they can not do so within the same locality. The Court finds that Defendants operate within the same locality as Plaintiffs and thus should be enjoined from the use of the *McEwen* name within the same locality.

b.

DID DEFENDANTS SELECT THE *MCEWEN* NAME WITH THE INTENT TO INJURE PLAINTIFFS OR FRAUDULENTLY AVAIL THEMSELVES OF PLAINTIFFS' GOOD NAME AND REPUTATION?

{45} While the Court has already determined that Defendants presence within the same locality as Plaintiffs prevents them from using the *McEwen* name, because it is possible that the locality requirement was abandoned by the North Carolina Supreme Court in *Zagier*, the Court will also evaluate whether Plaintiffs have shown a likelihood of success in proving that Defendants selected the *McEwen* name with the intent to injure Plaintiffs or fraudulently avail themselves of Plaintiffs' good name and reputation.

{46} As noted above: (1) Defendants began funeral home operations at the Morehead Street location previously used by Plaintiffs for the same services (Pls.' Mem. 4); (2) Defendants erected a sign on that location with script "similar to [that] used on the [MFS] sign [in place] at this location until the early 2000s" (Aff. of Polydys ¶ 15); (3) Defendants "have decorated the lobby of [the Morehead Street location]" with the same painting "of Carl J. McEwen that is displayed in the lobby of [MFS] at Sharon Memorial Park and [MFS] Mint Hill Chapel" (Aff. of Polydys ¶ 18); and (4) Ellington, Jr., who has not customarily used his middle name in other

business contexts, started using McEwen when Defendants opened their competing funeral home business. (Aff. Polydys ¶¶ 20–21.)

{47} All of these facts suggest an intent on the part of the Defendants to injure the Plaintiffs or avail themselves of Plaintiffs' good name and reputation. While the Court cannot say that the lawful use of an individual's name in the promotion of a business could be evidence of an intent to injure, the fact that a person inexplicably changes the use of their middle name when they enter into a competing endeavor suggests to the Court that there was an intent to acquire the existing company's good will and reputation. Accordingly, the Court finds, for the purposes of this Motion, that Plaintiffs have provided sufficient evidence to show a likelihood of success in demonstrating that Defendants intended to avail themselves of Plaintiffs' good name and reputation.

## D.

## ARE PLAINTIFFS BARRED FROM RECEIVING THE BENEFIT OF AN EQUITABLE REMEDY UNDER THE DOCTRINE OF CLEAN HANDS?

{48} "One who seeks equity must do equity." *Creech v. Melnik*, 347 N.C. 520, 529, 495 S.E.2d 907, 913 (1998). "The fundamental maxim, '[h]e who comes into equity must come with clean hands,' is a well-established foundation principle upon which the equity powers of the courts of North Carolina rest." *Id.* The doctrine of clean hands

> is an equitable defense which prevents recovery where the party seeking relief comes into court with unclean hands. However, '[r]elief is not to be denied because of general iniquitous conduct on the part of the complainant or because of the latter's wrongdoing in the course of a transaction between him and a third person, or because of a wrong practiced by both parties on a third person . . . .'

*Ray v. Norris*, 78 N.C. App. 379, 384–85, 337 S.E.2d 137, 141 (1985) (quoting 27 AM. JUR. 2D *Equity* § 142, at 678–79 (1966)). When determining whether the party seeking equitable relief has come to the court with clean hands, "[t]he conduct of both parties must be weighed in the balance of equity . . . ." *Creech*, 347 N.C. at 529, 495 S.E.2d at 913.

{49} Defendants argue that Plaintiffs should be barred from receiving the equitable relief of an injunction because they have taken anticompetitive action against potential suppliers to the Defendants. (Defs. Mem. 13.) After reviewing Defendants' Memorandum in Opposition to the Motion and the supporting affidavits, the Court, however, can not conclude that Plaintiffs' alleged acts are anything more than innocuous conduct. While refusing to do business with those who work with the Defendants may be petty, it does not, based on the facts alleged, rise to such a level as to leave Plaintiffs with unclean hands.

E.

WHAT EFFECT DO REGISTRATIONS WITH THE NORTH CAROLINA BOARD OF FUNERAL SERVICES AND NORTH CAROLINA SECRETARY OF STATE HAVE ON A PARTY'S COMMON LAW RIGHTS?

{50} Defendants suggest that Plaintiffs' right to use the *McEwen* name might be diminished because Defendants were able to register the *McEwen* name with the North Carolina Board of Funeral Services and the North Carolina Secretary of State. However, "registration does not authorize the use . . . of a name in violation of the rights of any third party under . . . the trademark act of this State, or other statutory or common law, and is not a defense to an action for violation of any of those rights." N.C. GEN. STAT. § 55D-20(e). Accordingly, the Court cannot conclude that Defendants' registrations had any effect on Plaintiffs' common law right to use the *McEwen* name.

V.

CONCLUSION

{51} Because the Court determined that Defendants should be enjoined under the standard adopted in *Bingham School*, it does not address, at this time, whether Defendant Ellington, Jr. is also proscribed from using his name because he sold his stock and other interests in MFS and MFS Mint Hill. Further, the Court leaves for another day its determination of whether the *McEwen* name has acquired secondary meaning as argued by Plaintiffs. For the reasons stated above, the Court

concludes that Plaintiffs have shown a likelihood of success on the merits and that they would suffer irreparable harm if injunctive relief is not granted.

{52} Accordingly, the Court GRANTS Plaintiffs' Motion and ORDERS that Defendants and their officers, directors, employees, agents, representatives, and those persons acting in concert or participation with Defendants, are immediately restrained and enjoined from any and all activities that use the *McEwen* name in the provision of funeral services within Charlotte, Mint Hill, Pineville, and Monroe. Defendants are thus prohibited from using the names *McEwen Ellington Funeral Services*, *McEwen Funeral Home, Inc.*, *McEwen Funeral Services, Inc.*, or any other similar mark, word, name, symbol, or slogan that incorporates the *McEwen* name. Any and all uses or proposed uses by Defendants of the *McEwen* name or any similar mark, including in signs, advertisements, or promotions materials, in connection with funeral services in Charlotte, Mint Hill, Pineville, and Monroe, are strictly prohibited.

SO ORDERED, this the 18th day of February 2013.