MARION PARTNERS, LLC, GEORGETOWN DEVELOPERS, LLC, MYRTLE RIDGE/501 ASSOCIATES, LLC, MANTEO PARTNERS, LLC AND KILL DEVIL HILLS ASSOCIATES, LLC, Plaintiffs v. WEATHERSPOON & VOLTZ, LLP, AND WILLIAM H. WEATHERSPOON, JR., Defendants

No. COA10-1122

(Filed 6 September 2011)

**Attorneys—legal malpractice—negligence—breach of contract—summary judgment—properly granted**

> The trial court did not err in a legal malpractice case by granting summary judgment in favor of defendants and dismissing all of the plaintiffs' claims. Summary judgment was properly allowed as to plaintiffs' negligence causes of action based on plaintiffs' contributory negligence. Furthermore, no evidence existed to support plaintiffs' breach of contract and negligence claims.

Appeal by plaintiffs from judgment entered 24 May 2010 by Judge Donald W. Stephens in Wake County Superior Court. Heard in the Court of Appeals 9 March 2011.

*Crawford & Crawford, LLP, by Robert O. Crawford, III, for plaintiff.*

*Hemmings & Stevens, PLLC, by Aaron C. Hemmings, for plaintiff.*

*Yates, McLamb & Weyher, LLP, by Dan J. McLamb and T. Carlton Younger, III, for defendants.*

ELMORE, Judge.

This dispute arises between William H. Weatherspoon, an attorney (defendant, along with his law firm, Weatherspoon & Voltz),[1] and the companies (plaintiffs[2]) that hired him to review leases between their company and CVS Corporation. Plaintiffs constructed the buildings in which CVS drugstores operated, leasing the buildings to the company for that purpose. They have used defendant's legal services since at least 2002.

---

1. Throughout, we refer to "defendant" rather than "defendants" because all of the conversations, understandings, etc. were with Mr. Weatherspoon as an individual.

2. There are five plaintiffs in this action, all of which are limited liability companies created by the same three individuals. Only three of the LLCs—Marion Partners, Georgetown Developers, and Myrtle Ridge—are actually party to the incidents that led up to this lawsuit. Throughout this opinion, the term "plaintiffs" refers only to these three businesses.

In January/February 2006, plaintiffs executed leases with CVS for properties in South Carolina, first having defendant review the leases. Those three leases included a new tax provision, referred to by the parties as Section 34(d)[3]:

> In the event Landlord sells the Premises and the Appropriate taxing authorities increase the assessed valuation and taxes on the Premises as a result of the sale, or if the Landlord takes any other action which causes a tax increase, then Tenant shall pays [sic] as Taxes, during the year of such sale and for all succeeding fiscal tax years, only the portion of the Taxes related to the assessed value of the Premises prior to the sale and Landlord shall pay all Taxes related to the increase in the assessed value of the Premises.

Essentially, it shifts certain tax burdens to the landlord from the tenants. In June 2006, the South Carolina legislature passed a law changing the way certain properties are assessed for tax purposes; pursuant to the new law, property can be so assessed upon sale, among other events. That law went into effect on 1 January 2007.

In the spring of 2008, plaintiffs became aware of the change in the tax law after having entered into purchase contracts with a buyer for the properties in question (referred to by the parties as the Marion and Georgetown properties). Per the deposition of Troy Legge[4], the broker who marketed the properties, after the new law was passed, the sale of the properties fell through based on the leases' inclusion of Section 34(d).

Plaintiffs sued defendant for legal malpractice; the trial court granted summary judgment in favor of defendant. On appeal, plaintiffs argue that the trial court erred by allowing defendants' motion for summary judgment, that the trial court erred by sustaining defendants' objection to consideration of certain statements in the affidavits of Crayne Howes and James Street, and that the trial court erred by dismissing plaintiffs' negligent misrepresentation and breach of contract claims as well as the claims of Manteo Partners and Kill Devil

---

3. The quoted language is in Section 34(d) of two of the leases involved in this case; in the third, it is in Section 34(h). We refer to it as Section 34(d) throughout for simplicity's sake.

4. Plaintiffs term Mr. Legge an "expert witness," but only a handful of pages from his deposition have been included in the Exhibits, and they are from the middle of that deposition (pages 62-67). Thus, any self-identification has been omitted from the reproduced pages of his deposition, and the only information this Court has about him is that he was the broker who marketed the properties.

Hills Associates. After careful consideration, we hold that the trial court properly granted summary judgment in favor of defendants and dismissed all of the plaintiffs' claims.

With respect to all of plaintiffs' negligence claims, we uphold the trial court's decision based on the defense of contributory negligence. As this Court recently held, "[c]ontributory negligence is a defense to a claim of professional negligence by attorneys, just as it is to any other negligence action." *Piraino Bros., LLC v. Atl. Fin. Group, Inc.*, ___ N.C. App. ___, ___, ___ S.E.2d ___, ___ (2011).

It is well established in North Carolina that "[o]ne who signs a written contract without reading it, when he can do so understandingly is bound thereby unless the failure to read is justified by some special circumstance." *Davis v. Davis*, 256 N.C. 468, 472, 124 S.E.2d 130, 133 (1962). Although plaintiffs try to suggest that this rule may be altered when the party has retained an attorney to review the contract, this Court has held otherwise: "[Plaintiff's] attorney owed her a duty to review and explain to her the legal import and consequences which would result from her executing the Separation Agreement. *However, this duty does not relieve her from her own duty to ascertain for herself the contents of the contract she was signing.*" *Lowry v. Lowry*, 99 N.C. App. 246, 254, 393 S.E.2d 141, 145 (1990) (emphasis added). Thus, under *Lowry*, although Mr. Weatherspoon had a duty to advise plaintiffs regarding the leases, that duty did not relieve plaintiffs from their duty to read the leases themselves. *See also Harris v. Bingham*, 246 N.C. 77, 79, 97 S.E.2d 453, 455 (1957) ("The right to rely upon the assumption that another will exercise due care is not absolute and must yield to the realities of the situation to the extent that if the plaintiff observes a violation of duty which imperils him, he must be vigilant in attempting to avoid injury to himself. If the defend- ant were guilty of negligence in failing to exercise reasonable care and skill as a real estate broker in drafting the contract of sale, a question not necessary for us to decide here, the plaintiffs are charged with full knowledge and assent as to the contents of the contract they signed . . . .") (citations omitted).

Plaintiffs, however, further argue that their failure to read the leases was justified by "special circumstances," as provided in *Davis*. *Davis* explained, however, that "[t]o escape the consequences of a failure to read because of special circumstances, complainant must have acted with reasonable prudence." 256 N.C. at 472, 124 S.E.2d at 133.

The sole "special circumstance" claimed by plaintiffs is their assertion that they had a "custom and practice" of relying upon Mr. Weatherspoon, with his "knowledge and ascent [sic]," to review the leases and "to notify them of any changes or additional language inserted into a new lease as compared to their prior leases." They argue that Mr. Weatherspoon accepting responsibility. under this claimed custom and practice "put the Members 'off their guard.' "

Contrary to this argument, the record in this case contains emails from Mr. Weatherspoon to each of plaintiffs' members directing them to read the lease for each of the properties that is the subject of this action. On 10 August 2005, Mr. Weatherspoon sent an email regarding one South Carolina lease stating: "Jay [Street], Crayne [Howes] and Leigh [Polzella]—please review the attached draft lease from CVS for the Conway site." The email noted that the lease contained a number of new paragraphs. Leigh Pozella responded on 13 September 2005 to Mr. Weatherspoon and the two other members: "I have reviewed the lease and have my comments below." On 3 December 2005, Mr. Weatherspoon emailed the three members regarding the Georgetown, South Carolina store: "Leigh, Jay and Crayne—please review the draft CVS lease for Georgetown, SC and provide me with any comments." Likewise, on the same date, he emailed the members regarding the Marion, South Carolina store: "Leigh, Jay and Crayne—please review the draft CVS lease for Marion, SC."

There is no dispute that plaintiffs' members received the emails, and plaintiffs do not address the emails in arguing that they were not contributorily negligent. Further, plaintiffs do not contend that they needed Mr. Weatherspoon to explain the legal import of the new tax provision. The record lacks any suggestion that they would not have understood the provision if they had read it. Given Mr. Weatherspoon's explicit request that plaintiffs' members review the attached draft leases, plaintiffs *chose* not to review the leases, despite this advice. They failed to "act[] with reasonable prudence" and are not entitled "[t]o escape the consequences of a failure to read because of special circumstances . . . ." *Davis*, 256 N.C. at 472, 124 S.E.2d at 133.

Moreover, the affidavits of Mr. Howes and Mr. Street constitute the sole evidence supporting plaintiffs' claim that Mr. Weatherspoon had assented to a "custom and practice" that he would "notify them of any changes or additional language inserted into a new lease," as plaintiffs argue in their brief. Plaintiffs contend that the trial court

erred in sustaining defendants' objection to these affidavits on the grounds that they contradicted Mr. Howes's and Mr. Street's depositions. We conclude that the trial court properly found that the affidavits did, in fact, contradict the depositions.

Mr. Howes, in his affidavit, stated:

> [I]f there were any new provisions added by CVS that were different from prior leases, it was our understanding, expectation and agreement that Mr. Weatherspoon, as our attorney, and according to our established custom and practice of doing business, would have identified any such term and notified us to specifically review such term.

He added: "I had specifically told Mr. Weatherspoon that we did not read the entire proposed leases and that we relied on him to do so and notify us of any modifications or additions to the proposed lease as compared to our prior leases."

Mr. Howes, in his deposition, talked about his personal "expectation" for what Mr. Weatherspoon would do and what Mr. Howes's personal practices were regarding leases. He did not refer to any agreement with Mr. Weatherspoon or any custom or practice to which Mr. Weatherspoon assented. Even as to his own expectations, Mr. Howes did not suggest that he expected Mr. Weatherspoon to identify all new provisions. He talked only about provisions that constituted "significant changes."

Mr. Street, in his affidavit, described a particular lease negotiation that took place in 2002 and stated:

> At that time, I informed Mr. Weatherspoon that I did not read proposed leases in their entirety and that I relied on him, as my attorney, to read the leases and to notify me of any new lease provisions and any changes to the proposed lease as compared to my prior leases. Since that time, the mutual understanding between Mr. Weatherspoon and I, and our custom and practice of doing business, has been to rely on Mr. Weatherspoon to identify and notify me of any new lease provisions and any changes to a proposed lease with CVS as compared to my prior leases with CVS or its subsidiaries.

Mr. Street then also included language that was, word for word, identical with language in Mr. Howes's affidavit asserting that,

if there were any new provisions added by CVS that were different from prior leases, it was our understanding, expectation and agreement that Mr. Weatherspoon, as our attorney, and according to our established custom and practice of doing business, would have identified any such term and notified us to specifically review such term.

Mr. Street, in his deposition, talked about "my course of business" and his "trust" that they "were being looked after" by Mr. Weatherspoon. He discussed what he "assumed" Mr. Weatherspoon would do. He did not mention an agreement, an agreed-upon custom and practice, or a mutual understanding. With respect to his 2002 conversation with Mr. Weatherspoon, Mr. Street testified that, after Mr. Weatherspoon had overlooked a clause in a lease for a particular transaction, the two men talked about it, and Mr. Street testified that he told Mr. Weatherspoon, " 'Please read the lease,' or something." When asked whether he had testified to everything he remembered regarding those discussions, he replied, "Yeah."

In short, in the depositions, there was no mention by either man of an agreement, an agreed-upon custom and practice, or even a mutual understanding with Mr. Weatherspoon that he would notify them of every change or addition to a new lease. The depositions addressed only the individual men's assumptions, personal expectations, and personal ways of doing business. The deposition testimony is a far cry from the claims in the affidavits that,

if there were any new provisions added by CVS that were different from prior leases, it was our understanding, expectation and agreement that Mr. Weatherspoon, as our attorney, and according to our established custom and practice of doing business, would have identified any such term and notified us to specifically review such term.

The additions and changes appearing in the affidavits are conclusory statements or recharacterizations more favorable to plaintiffs. The affidavits materially alter the deposition testimony in order to address gaps in the evidence necessary to survive summary judgment. As this Court observed in *Wachovia Mortgage Co. v. Autry-Barker-Spurrier Real Estate, Inc.*, 39 N.C. App. 1, 9-10, 249 S.E.2d 727, 732 (1978) (quoting *Perma Research & Dev. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)), " '[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screen-

ing out sham issues of fact.' " The trial court, therefore, properly excluded these portions of the affidavits.

To the extent that plaintiffs have relied upon Mr. Weatherspoon's deposition to support their claim that Mr. Street told Mr. Weatherspoon that he expected Mr. Weatherspoon to notify him each time there was a new provision in a lease, they have not fully quoted that testimony. After Mr. Weatherspoon, in his deposition, acknowledged a conversation with Mr. Street regarding a prior lease problem, he was asked: "Is it your testimony that you remember that Mr. Street's position, with respect to new leases, was that it was your duty to notify him if there were any new provisions?" He responded: "[N]ot in so many words. It would have been an understanding. Easiest way to put it would be of—of changes that have an impact, or changes that matter."

Mr. Weatherspoon's testimony that there was an understanding that he would notify plaintiffs of any lease changes that had an impact or changes that mattered does not amount to "special circumstances" that relieved plaintiffs of their duty to read the leases, especially given the emails urging them to do so and the fact that plaintiffs would have understood the significance of the tax provision if they had read it. To hold otherwise would require this Court to implicitly overrule *Lowry*. Accordingly, summary judgment was properly allowed as to plaintiffs' negligence causes of action based on plaintiffs' contributory negligence.

Turning to plaintiffs' breach of contract claim, we assume without deciding that it may be asserted independently of a legal malpractice claim. Significantly, plaintiffs have cited no authority at all in support of the breach of contract claim. In arguing that summary judgment was improper, plaintiffs state: "Plaintiffs contend that they specifically contracted with Weatherspoon to notify them of any additional language in Part II of a proposed lease as compared to their prior leases." The only evidence of a specific agreement of this nature that arguably could support a contract claim appears in Mr. Howes's and Mr. Street's affidavits. Because the trial court properly concluded that the assertions in the affidavits regarding an agreement to notify plaintiffs of any new lease language were in conflict with the deposition testimony and were, therefore, properly excluded, no evidence exists to support plaintiffs' breach of contract claim.

Finally, plaintiffs Manteo Partners and Kill Devil Hills Associates have asserted claims for breach of contract, negligence, and legal

IN RE J.H.K.

[215 N.C. App. 364 (2011)]

malpractice based on the decision to negotiate with CVS to transfer the objectionable tax provision from the leases on two of the South Carolina properties to North Carolina properties owned by those two plaintiffs. As Mr. Howes's and Mr. Street's affidavits both state, this action was undertaken on the advice of Mr. Weatherspoon to mitigate the damages arising with respect to the South Carolina properties.

In response to defendant's argument that plaintiffs have failed to present any evidence that Mr. Weatherspoon violated the standard of care in connection with this advice, plaintiffs argue only that (1) "[b]ased on [Mr. Weatherspoon's] advice, Mr. Street agreed to move forward with the transfer"; and (2) plaintiffs' real estate expert "testified that the mere existence of the problematic lease language caused significant damages to a property regardless of the tax law of the state in which the property is located." Plaintiffs conclude: "Thus, Manteo and Kill Devil Hills sustained damages as a direct result of the negligent advice given by Weatherspoon."

In other words, plaintiffs argue only that they were damaged by following Mr. Weatherspoon's advice. They have pointed to no evidence that the advice was negligent. Even apart from the standards applicable to legal malpractice actions, "[n]egligence is not presumed from the mere fact of injury." *Roumillat v. Simplistic Enters., Inc.*, 331 N.C. 57, 68, 414 S.E.2d 339, 345 (1992). Consequently, without any evidence of negligence, the trial court properly granted summary judgment on the Manteo Partners and Kill Devil Hills Associates' claims as well.

Affirmed.

Judges BRYANT and GEER concur.