NO. COA14-233

NORTH CAROLINA COURT OF APPEALS

Filed: 6 January 2015

JOANN HESTER, Individually
and as Personal Representative
of the Estate of Leland Hester,
    Plaintiff-Appellant,

    v.                                    Bladen County
                                          No. 12 CVS 402
HUBERT VESTER FORD, INC., and
LARRY McPHAIL,
    Defendants-Appellants.


    Appeal by Plaintiff from order and judgment filed 11 September 2013, *nunc pro tunc* 26 August 2013, by Judge Douglas B. Sasser in Superior Court, Bladen County. Heard in the Court of Appeals 26 August 2014.

    *Christopher W. Livingston for Plaintiff-Appellant.*

    *Womble & Campbell, P.A., by H. Goldston Womble, Jr.; and C. Michael Thompson, for Defendants-Appellees.*


    McGEE, Chief Judge.

    Plaintiff filed claims against Hubert Vester Ford, Inc. ("Vester Ford") and Larry McPhail ("Mr. McPhail") ("Defendants"), for unfair and deceptive trade practices, fraud, and common law extortion arising out of a vehicle purchase. Plaintiff alleged Defendants contracted to sell Plaintiff a Jeep

vehicle under certain terms but then compelled Plaintiff to sign a second, less-favorable contract under the threat of repossession. We find that most, but not all, of Plaintiff's claims were properly resolved through summary judgment.

## I. Standard of Review

This Court reviews a trial court's order allowing summary judgment *de novo*. *Builders Mut. Ins. Co. v. North Main Const., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006). This review is limited to determining whether "there is no genuine issue as to any material fact" and whether the moving parties were entitled to judgment in their favor as a matter of law. *See Blades v. City of Raleigh*, 280 N.C. 531, 544, 187 S.E.2d 35, 43 (1972). It generally is sufficient for a nonmoving party to survive summary judgment where the party can "produce a forecast of evidence demonstrating that [the party] will be able to make out at least a *prima facie* case at trial." *Creech v. Melnik*, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998) (citation and internal quotations omitted). However,

> in passing upon a motion for summary judgment, all affidavits, depositions, answers to interrogatories and other material filed in support or opposition to the motion must be viewed in the light most favorable to the party opposing the motion, and such party is entitled to the benefit of all inferences in [the party's] favor which may be reasonably drawn from such material.

*Whitley v. Cubberly*, 24 N.C. App. 204, 206-07, 210 S.E.2d 289, 291 (1974). "The slightest doubt as to the facts entitles the non-moving party to a trial." *Ballenger v. Crowell*, 38 N.C. App. 50, 53, 247 S.E.2d 287, 290 (1978).

## II. Background

Because this is an appeal by Plaintiff from a grant of summary judgment against her, we take the facts in the light most favorable for Plaintiff. Plaintiff's son, Ryan Hester ("Ryan"), became interested in purchasing a 2007 Jeep Wrangler ("the Jeep") from Vester Ford sometime near Labor Day in 2009. Ryan had a preliminary phone conversation with Melvin Scott ("Mr. Scott"), a salesperson for Vester Ford. During that phone call, Ryan obtained some type of "pre-approval," but Mr. Scott also notified Ryan that he would need a co-signer in order to purchase the Jeep. Plaintiff, Ryan's mother, agreed to be that co-signer.

Plaintiff and Ryan traveled to Vester Ford the following evening and test-drove the Jeep. While at Vester Ford, they interacted with Mr. Scott and Mr. McPhail, and both stayed late to accommodate Plaintiff's and Ryan's schedules. Plaintiff and Ryan presented Defendants with bank and pay documents that showed their respective incomes, which were modest. However,

Defendants allegedly agreed to sell the Jeep to Plaintiff and Ryan for a base price of about $22,000.00, with a trade-in credit of $1,000.00 for Plaintiff's Mercury Grand Marquis ("the Grand Marquis"), and monthly payments in the $300.00 to $350.00 range for between sixty (60) and seventy-two (72) months. Plaintiff and Ryan testified during their depositions that: (1) all parties purportedly signed a purchase contract containing these terms (the "original" contract); (2) the Grand Marquis' license plate was transferred to the Jeep at signing; and (3) Plaintiff and Ryan left with the Jeep that evening.

Plaintiff has been unable to produce a copy of the "original" contract, and Defendants deny its existence. Defendants contend they sold the Jeep to Plaintiff on 30 September 2009. However, Plaintiff presented an affidavit from a neighborhood Labor Day party attendee, averring that he saw Ryan in possession of the Jeep several weeks before 30 September 2009. Vester Ford also submitted a credit application on Plaintiff's behalf to Marine Federal Credit Union to finance the purchase of the Jeep ("Marine Credit application"); the Marine Credit application was dated 24 September 2009, six days before Defendants state they sold Plaintiff the Jeep. Notably, this credit application greatly exaggerated Plaintiff's finances. Finally, the Jeep was transferred to Plaintiff's insurance on 28

September 2009, two days before Defendants state they sold Plaintiff the Jeep.[1]

Plaintiff alleged that Mr. Scott contacted her in early October 2009 and stated that: (1) the financing for Plaintiff's recent Jeep purchase had fallen through; (2) Plaintiff needed to sign a new purchase contract for the Jeep, with new financing; and (3) if Plaintiff did not sign the new contract, the Jeep would be repossessed. Soon thereafter, Mr. Scott arrived at Plaintiff's residence and presented Plaintiff and her husband with the new contract, which was backdated to 30 September 2009 (the "30 September" contract). Mr. Scott allegedly informed Plaintiff and her husband that the terms in the 30 September contract were the same as those in the "original" contract. Plaintiff alleged that Mr. Scott then physically covered the top half of the 30 September contract when he presented it to Plaintiff and her husband, obscuring their view of the terms therein. Neither Plaintiff nor her husband asked to read the terms of the 30 September contract before signing it.[2]

---

[1] Some of Vester Ford's documentation indicates that Vester Ford did not actually take title to the Jeep until 30 September 2009.

[2] Plaintiff's co-plaintiff husband has since passed away, and Plaintiff is the personal representative of her husband's estate in this matter. Plaintiff's husband's involvement in

The 30 September contract required that Plaintiff make monthly payments of $614.83, with an interest rate of 14.69 percent, for sixty (60) months — almost doubling the monthly payments that Plaintiff contends were required under the "original" contract. The terms in the 30 September contract were based on a line of credit that Vester Ford obtained on Plaintiff's behalf from Ford Motor Credit Company after financing for the "original" contract reportedly fell through. The credit application submitted to Ford Motor Credit Company by Vester Ford inflated Plaintiff's financial data even more than the Marine Credit application.

Ryan remained in possession of the Jeep approximately nine months after Plaintiff signed the 30 September contract, although he only made a couple of monthly payments thereon. The Jeep was repossessed in July 2010, was sold, and a deficiency judgment was entered against Plaintiff for the remainder of the amount owed under the 30 September contract. However, that deficiency judgment was set aside by a consent order, and Plaintiff currently owes nothing on the Jeep.

---

this case primarily arises out of his signing the 30 September contract.

Plaintiff filed a complaint against Defendants for unfair and deceptive trade practices ("UDTP"), fraud, and common law extortion. Plaintiff and Defendants then moved for summary judgment against each other. By order filed 11 September 2013, the trial court granted Defendants' motion for summary judgment but denied Plaintiff's motion. Plaintiff appeals.

III. Plaintiff's Motion for Summary Judgment Denied

As a preliminary matter, Plaintiff appeals both the trial court's grant of summary judgment against her and the trial court's denial of her motion for summary judgment against Defendants. However, "the denial of a motion for summary judgment is not reviewable during appeal from a final judgment rendered in a trial on the merits." *Harris v. Walden*, 314 N.C. 284, 286, 333 S.E.2d 254, 256 (1985). The trial court's grant of Defendants' motion for summary judgment was a final judgment on the merits. *See Id.* Therefore, on appeal, we will not review Plaintiff's denied motion for summary judgment.

IV. Defendants' Motion for Summary Judgment Granted

*A. Claims Arising Under the 30 September Contract*

1. <u>Unfair and Deceptive Trade Practices</u>

Plaintiff presents this Court with a multitude of arguments on appeal, and many of them emanate from a core UDTP claim related to the formation of the 30 September contract. "In

order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show:  (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).  The second requirement, that the act or practice be "in or affecting commerce," is not at issue in the present case.  Thus, in order to survive summary judgment, Plaintiff must establish a material question of fact as to whether Defendants committed unfair or deceptive acts that proximately injured Plaintiff.

Plaintiff contends that she and Defendants entered into the "original" contract for the Jeep sometime before Labor Day in 2009.  Plaintiff and Ryan testified during their depositions that they signed this "original" contract with Defendants. Plaintiff also presented the following circumstantial evidence in support of the existence of the "original" contract:  (1) an affidavit from a neighborhood Labor Day party attendee, averring that he saw Ryan in possession of the Jeep early in September 2009; (2) a credit application that Vester Ford submitted on Plaintiff's behalf on 24 September 2009 to finance the purchase of the Jeep, six days before Defendants state they sold Plaintiff the Jeep; and (3) an automobile insurance policy

statement showing that the Jeep was transferred to Plaintiff's auto insurance on 28 September 2009, two days before Defendants state they sold Plaintiff the Jeep. Plaintiff correctly points out that transferring auto insurance to a consumer's policy is only supposed to occur once financing is finalized and the consumer has taken title to the vehicle. *See* N.C. Gen. Stat § 20-75.1 (2013).

In light of this evidence, the fact that Defendants adamantly deny the existence of the "original" contract creates a material issue of fact in the case before this Court. *See Durham Life Broadcasting, Inc. v. Internat'l Carpet Outlet*, 63 N.C. App. 787, 788, 306 S.E.2d 459 (1983) ("There is clearly a dispute in the case *sub judice* where the defendant denies the existence of a contract."). However, Defendants argue that summary judgment for Defendants was proper nonetheless. They highlight the fact that Plaintiff has not produced a copy of the "original" contract and that Plaintiff's sworn statements as to the terms of this contract are less than precise. However, this is not necessarily dispositive of the circumstantial evidence that Plaintiff presented to the trial court as to the possible *existence* of the "original" contract.

Taking the evidence in a light most favorable to Plaintiff, the non-moving party in Defendants' motion for summary judgment,

and granting Plaintiff all reasonable inferences therefrom, we must assume that the "original" contract existed. Therefore, we assume that Plaintiff had a property interest in the Jeep before she was presented with the 30 September contract. As such, Mr. Scott's threat to repossess the Jeep if Plaintiff did not sign the 30 September contract presents a material question as to whether Vester Ford, through its agent, Mr. Scott, committed an unfair or deceptive act in or affecting commerce. If so, the resulting harm would be that Plaintiff was subjected to a subsequent purchase contract, the 30 September contract, on disadvantageous terms. Finally, contrary to Defendants' contention that Plaintiff has suffered no actual damages because her liability to Ford Motor Credit Company on the loan for the Jeep was extinguished, Plaintiff has forecast *some* actual damages resulting from Vester Ford's alleged misconduct – for instance, losing the value of her Grand Marquis after the Jeep was repossessed.[3] Therefore, Plaintiff has sufficiently established the necessary elements to support an UDTP claim.

---

[3] Because Plaintiff appeals from the trial court's grant of summary judgment against her, our review of Plaintiff's damages need not probe beyond finding the existence of actual damages. *See Creech*, 347 N.C. at 526, 495 S.E.2d at 911 ("[It is sufficient for a nonmoving party to survive summary judgment where the party can] produce a forecast of evidence

As Defendants correctly point out, notwithstanding the possible existence of the "original" contract, Plaintiff's failure to read the 30 September contract, and without even requesting an opportunity to do so, could preclude her from recovery under the new contract. "One who signs a written contract without reading it, when [she] can do so understandingly[,] is bound thereby unless the failure to read is justified by some special circumstance." *Davis v. Davis*, 256 N.C. 468, 472, 124 S.E.2d 130, 133 (1962) (citations omitted). At its core, the question is whether Plaintiff acted with "reasonable prudence" by relying on Mr. Scott's assurances that the terms of the 30 September contract were the same as those in the "original" contract, except for the source of financing. *See id.* "What a reasonably prudent person will or will not do under various circumstances . . . is nearly always a question of fact, not of law. Only when the facts are such that reasonable minds can reach but one conclusion does the question become one of law." *Hulcher Brothers & Co. v. N.C. Dep't of Transportation*, 76 N.C. App. 342, 343, 332 S.E.2d 744, 745 (1985). Moreover,

---

demonstrating that [the party] will be able to make out at least a *prima facie* case at trial.").

> [i]t is only in exceptional cases that the issue of reasonable reliance may be decided by the summary judgment procedure. . . . [An aggrieved party who failed to read a contract] will not be charged with knowledge of the contents of [the contract she] signed *if it were obtained* by *trick or artifice.*

*Northwestern Bank v. Roseman*, 81 N.C. App. 228, 234, 344 S.E.2d 120, 125 (1986), *aff'd*, 319 N.C. 394, 354 S.E.2d 238 (1987) (emphasis added) (citations omitted).

Although Plaintiff's failure to read the 30 September contract likely is harmful to her claim, Plaintiff contends that her signature on the 30 September contract was made under duress and obtained through fraud. Given that we must presume Plaintiff was operating under the notion that the "original" contract established a set, binding, and existent agreement between her and Vester Ford, there remains the question of whether Plaintiff reasonably relied on Mr. Scott's assertions that the terms of the 30 September contract were identical to those in the "original" contract, except for the source of financing. Alternatively, when faced with Mr. Scott's threat to repossess the Jeep, there is a question as to whether Plaintiff would have signed the 30 September contract under duress, even if she had read it and objected to the new terms. These are questions of fact for a jury to determine.

Defendants further assert that Plaintiff is estopped from recovery because she accepted the benefits of the 30 September contract by using the Jeep for a number of months after signing the 30 September contract. To support this contention, Defendants note that "the acceptance of benefits [under a contract] precludes a subsequent inconsistent position [by an aggrieved party], even where acceptance is involuntary, arises by necessity, or where . . . a party voluntarily accepts a benefit to avoid the risk of harm". *Shell Island Homeowners Ass'n v. Tomlinson*, 134 N.C. App. 217, 226, 517 S.E.2d 406, 413 (1999) (citing *Carolina Medicorp, Inc. v. Board of Trustees*, 118 N.C. App. 485, 493-93, 456 S.E.2d 116, 120 (1995)) (quotes omitted).

This authority, however, is distinguishable from the present case. *Carolina Medicorp*, on which Defendants' authority relies, involved a contractual dispute between some North Carolina hospitals and the North Carolina state employee health insurance plan. *Carolina Medicorp*, 118 N.C. App. at 487-88, 456 S.E.2d at 117-18. The plaintiff hospitals had contracted to accept lower reimbursement rates in exchange for being designated "preferred providers" by the state health plan; state employees, in turn, would pay less out-of-pocket for services received at "preferred providers," making the hospitals

financially attractive to patients. *Id.* The hospitals subsequently challenged the lower reimbursement rates under their contracts, contending that the hospitals entered into the contracts involuntarily. *Id.* However, the hospitals were estopped from litigating the issue because they had already accepted the benefits of being "preferred providers" under the plan. *Id.* at 492-94, 456 S.E.2d at 120-21 ("[V]oluntariness is not an element under the doctrine of quasi estoppel. Furthermore, even if it were an element of quasi estoppel, petitioners were not compelled to sign the contracts. They chose to avoid the risk of losing patients to other preferred provider hospitals by signing the contracts.").

In the present case, Plaintiff is not challenging the *enforcement* of the 30 September contract with Vester Ford; indeed, a default judgment was entered against Plaintiff after she stopped making monthly payments to Ford Motor Credit Company, and that default judgment was later set aside. There is nothing left to enforce under the 30 September contract. Instead, Plaintiff contends that Defendants engaged in unfair and deceptive trade practices during the *formation* of the 30 September contract, which presents a different legal question.

"[T]he essential purpose of quasi-estoppel . . . is to prevent a party from benefitting by taking two clearly

inconsistent positions" under a contract. *B & F Slosman v. Sonopress, Inc.*, 148 N.C. App. 81, 88, 557 S.E.2d 176, 181 (2001). North Carolina's UDTP laws, however, are designed to provide consumers with a remedy for injuries done to them by dishonest and unscrupulous business practices. *See* N.C. Gen. Stat. § 75-16 (2013). Even where an aggrieved party is estopped from taking a subsequent inconsistent position under a contract due to quasi-estoppel, the party on the other side of the agreement is not categorically absolved of its unlawful acts during the formation of that same contract. Therefore, quasi-estoppel does not apply in the present case.

Plaintiff has established a *prima facie* UDTP claim against Vester Ford regarding the formation of the 30 September contract. The fact that Plaintiff has not produced the "original" contract and did not read the 30 September contract is not necessarily dispositive. Moreover, because Plaintiff's UDTP claim does not challenge the enforcement of the 30 September contract, quasi-estoppel does not apply. As such, the trial court erred by granting summary judgment as to Vester Ford on this claim.

## 2. Fraud

Plaintiff's complaint also raised an alternative, but related, fraud claim against Defendants based on the same facts

that gave rise to Plaintiff's UDTP claim above.  The elements of fraud are well-established: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Helms v. Holland*, 124 N.C. App. 629, 634, 478 S.E.2d 513, 516 (1996) (citation and quotes omitted).  Plaintiff presented evidence that Vester Ford intentionally and falsely represented to Plaintiff that Vester Ford could repossess the Jeep in order to induce her to sign the 30 September contract.  Therefore, for reasons similar to those discussed in the previous section, Plaintiff's alternative claim for fraud as to Vester Ford should survive summary judgment.

### 3. Common Law Extortion

Plaintiff's complaint raised a third alternative tort claim for common law extortion based on the same facts that gave rise to her UDTP and fraud claims.  However, no civil cause of action for extortion currently exists under North Carolina law.  *See Free Spirit Aviation, Inc. v. Rutherford Airport Auth.*, 191 N.C. App. 581, 585, 664 S.E.2d 8, 12 (2008).  Nonetheless, Plaintiff proposes that "[e]ven if extortion is not yet a recognized tort [under North Carolina law], it must become one."

To date, this Court has not been presented with a direct, supported, or convincing argument that extortion should be a cognizable tort under North Carolina law. *See, e.g., Brawley v. Elizabeth Townes Homeowners Ass'n, Inc.*, __ N.C. App. __, __ S.E.2d __, COA14-135, *slip op*. at 9-10 (Aug. 19, 2014) (unpublished) (affirming the dismissal of, *inter alia*, a *pro se* extortion claim on collateral estoppel grounds); *Lawson v. White*, 197 N.C. App. 758, 680 S.E.2d 904, COA07-296-2, *slip op.* at 5 (July 7, 2009) (unpublished) ("Plaintiff fails to cite any cases on point and fails to set forth what the elements of [extortion] might be."); *Free Spirit Aviation*, 191 N.C. App. at 585, 585 n.3, 664 S.E.2d at 12, 12 n.3 (2008) ("[Plaintiffs' complaint . . . expressly states a claim for extortion. . . . [However,] the issue of whether a civil claim for extortion exists in North Carolina was not argued [on appeal, so] we make no ruling either way on this issue."). Although "this Court will not shirk its duty to fully consider new causes of actions when they are properly presented," *Woodell v. Pinehurst Surgical Clinic, P.A.*, 78 N.C. App. 230, 233, 336 S.E.2d 716, 718 (1985), *aff'd*, 316 N.C. 550, 342 S.E.2d 523 (1986), *overruled on other grounds by Johnson v. Ruark Obstetrics*, 327 N.C. 283, 300-01, 395 S.E.2d 85, 95 (1990), so too must we proceed with the utmost caution and deliberateness in the face of such a request.

Plaintiff, in support of her argument that extortion should be a cognizable tort under North Carolina law, presents this Court with non-controlling authority from New Jersey, *People Exp. Airlines, Inc. v. Consol. Rail Corp.*, 495 A.2d 107, 111 (N.J. 1985), which discusses the adaptability of the common law in the face of significant, long-term shifts in societal norms. Plaintiff also cites the Open Courts Clause of the North Carolina Constitution, which states that "[a]ll courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay." N.C. Const. Art. 1 § 18. In light of this authority, Plaintiff contends that her remedy for Defendants' inducing her to sign the 30 September contract, "falls between the two stools of fraud (if deception is absent) and conversion (if consent is present)[.]" Between these two "stools," Plaintiff argues, necessarily sits her claim for extortion. We disagree.

First, we note that Plaintiff *has* raised a claim for fraud, alleging deception by Defendants, which allegedly was aimed at inducing Plaintiff to sign the 30 September contract. Second, the space between the two "stools" of fraud and conversion has been fully, and adequately, occupied by Plaintiff's UDTP claim.

Plaintiff argues in her brief that she would need to prove two things for an extortion claim against Defendants: (1) that Defendants unlawfully threatened Plaintiff with repossession of the Jeep (2) in order to obtain value from Plaintiff by binding her to the allegedly disadvantageous terms of the 30 September contract. These essentially are the same facts that Plaintiff needs to prove in her UDTP claim and to obtain appropriate relief from the alleged harm done to her by Defendants. As such, Plaintiff is not being denied a "remedy by due course of law" presently, and we decline to use this case to recognize a cognizable tort of common law extortion under North Carolina law.

*B. Claims Arising Under the "Enhanced" Credit Applications*

### 1. Unfair and Deceptive Trade Practices

On appeal, Plaintiff attempts to argue that Defendants committed unfair and deceptive trade practices by submitting credit applications on her behalf for the purchase of the Jeep that greatly "enhanced" Plaintiff's financial data. However, Plaintiff did not plead this claim in her complaint. Therefore, we will not consider it. *See* N.C.R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party

desired the court to make if the specific grounds were not apparent from the context.").

## 2. Fraud

Plaintiff also alleged fraud against Defendants based on Defendants' purportedly "enhancing" Plaintiff's financial information when submitting credit applications on her behalf. Again, the elements of fraud are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Helms v. Holland*, 124 N.C. App. 629, 634, 478 S.E.2d 513, 516 (1996) (citation and quotes omitted). Plaintiff does not contend that Defendants made false representations to Plaintiff regarding her financial information. Instead, Plaintiff's fraud claim here rests on the contention that Ford Motor Credit Company was deceived by Defendants' "enhancing" Plaintiff's financial data when submitting credit applications on her behalf and that Plaintiff was subsequently injured thereby. Plaintiff asserts that "[e]lements (2), (3), and (4) [of fraud] do not require that the deceived person be the same person as the injured party." However, Plaintiff provides this Court with no authority to support this argument, and we do not agree.

Notably, Plaintiff did not file a claim of constructive fraud against Defendants. A claim for constructive fraud would require only that Plaintiff show that she and Defendants were in a "relation of trust and confidence . . . [which] led up to and surrounded the consummation of the transaction in which [Defendants are] alleged to have taken advantage of [their] position of trust to the hurt of [Plaintiff]." *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950). "[C]harging actual fraud is 'more exacting' than charging constructive fraud." *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981).

We need not, and do not, decide whether Defendants, by allegedly "enhancing" Plaintiff's financial data while obtaining credit on her behalf, may have committed constructive fraud against Plaintiff; Plaintiff did not plead such a claim in her complaint. *See* N.C.R. App. P. 10(a)(1). Thus, restricting our analysis to the "exacting" elements of "actual" fraud, Plaintiff has not sufficiently pleaded facts that Defendants made deceptive statements to Plaintiff regarding her financial data and in the course of obtaining a line of credit on her behalf. Therefore, Plaintiff has not established a *prima facie* fraud claim against Defendants here, and the trial court did not err by granting summary judgment on this claim.

*C. Summary Judgment as to Mr. McPhail*

Finally, Plaintiff assigns error to the trial court's granting summary judgment as to her claims against Mr. McPhail.

1. <u>Mr. McPhail's Liability Regarding the 30 September</u>

<u>Contract</u>

On appeal, Plaintiff argues that Mr. McPhail should be held personally liable in the present case because Mr. McPhail knew of Plaintiff's modest finances, but he authorized the 30 September contract nonetheless, and this resulted in harm to Plaintiff. "As an essential element of a cause of action under G.S. 75-16 [for UDTP], [P]laintiff must prove . . . that [P]laintiff has suffered actual injury as a proximate result" of Defendants' actions. *Bailey v. LeBeau*, 79 N.C. App. 345, 352, 339 S.E.2d 460, 464 (1986), *aff'd as modified*, 318 N.C. 411, 348 S.E.2d 524 (1986). The same is true for a claim of fraud. *See Jay Group, Ltd. v. Glasgow*, 139 N.C. App. 595, 599–601, 534 S.E.2d 233, 236–37 (2000).

Although Mr. McPhail may have been aware of the modest finances of Plaintiff and Ryan, the financing terms in the 30 September contract that Mr. McPhail approved were those given to Vester Ford by the Ford Motor Credit Company. Plaintiff has not alleged that Mr. McPhail was aware of, or in any way involved with, the "enhancements" to Plaintiff's financial data in the

respective credit application that lead to the terms of the 30 September contract. As such, Mr. McPhail's merely authorizing the 30 September contract alone is not sufficient to maintain an UDTP or fraud claim against him.

2. Mr. McPhail's Liability Regarding the "Original" Contract

On appeal, Plaintiff also asserts certain additional facts as to her interactions with Mr. McPhail. Specifically, she argues that Mr. McPhail should be held personally liable in the present case because he was the Vester Ford employee who negotiated and agreed to the "original" contract; yet he still authorized the 30 September contract. Notably, in Plaintiff's complaint, she asserted that

> 14. Mr. Scott or Mr. McPhail on behalf of Vester told Mrs. Hester and Ryan that their credit was approved, and agreed unconditionally to sell the Jeep to Ryan and Mrs. Hester for a principal amount of about $23,000, paid in installments of about $320 per month (but not more than $350/month) for 60 months, in return for a trade-in allowance of $1,000 on Mrs. Hester's 1993 Mercury Grand Marquis.

Although Plaintiff's complaint named "Mr. Scott *or* Mr. McPhail" as the one who negotiated and agreed to the "original" contract, the depositions of Plaintiff and Ryan do not implicate Mr. McPhail as such. Plaintiff and Ryan even testified that they almost exclusively dealt with Mr. Scott during the purchase of

the Jeep and that Mr. McPhail performed only ministerial functions in relation thereto. In fact, the only evidence presented to the trial court that Mr. McPhail was the Vester Ford employee who negotiated and agreed to the "original" contract came in the form of nearly identical affidavits, filed by Plaintiff and Ryan, only four days before the summary judgment hearing on 26 August 2013. On this point, it is clear:

> The affidavits [presented by Plaintiff and Ryan] materially alter the deposition testimony in order to address gaps in the evidence necessary to survive summary judgment. . . . [I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his [or her] own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*See Marion Partners, LLC v. Weatherspoon & Voltz, LLP*, 215 N.C. App. 357, 362-63, 716 S.E.2d 29, 33 (2011) (citation and quotes omitted). Therefore, the trial court properly was not persuaded by this "evidence" in granting summary judgment as to Mr. McPhail. Plaintiff has presented no other argument that Mr. McPhail should be held personally liable in this case for his involvement in the purported execution of the "original" contract.

V. Conclusion

The trial court properly granted summary judgment to Mr. McPhail on all of Plaintiff's claims against him. The trial court also properly granted summary judgment to Vester Ford with respect to Plaintiff's common law extortion claim, as well as her UDTP and fraud claims arising out of Vester Ford allegedly "enhancing" Plaintiff's financial information on credit applications. However, the trial court erred by granting summary judgment to Vester Ford on Plaintiff's UDTP and fraud claims arising out of the formation of the 30 September contract.

Reversed in part, and remanded; affirmed in part.

Judges BRYANT and STROUD concur.