IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1264

Filed: 19 November 2019

New Hanover County, No. 14 CVS 003

EQUITY TRUST COMPANY CUSTODIAN FOR BENEFIT OF GORDON FRIEZE IRA TRADITIONAL ACCOUNT NUMBER 113190 and ROTH ACCOUNT NUMBER 113192, and GORDON P. FRIEZE, JR., Plaintiffs

v.

S&R GRANDVIEW, LLC, Defendant

Appeal by Plaintiffs from Orders entered 18 July 2014 by Judge W. Allen Cobb, Jr. and 4 May 2018 by Judge R. Kent Harrell in New Hanover County Superior Court. Heard in the Court of Appeals 22 May 2019.

*Law Offices of G. Grady Richardson, Jr., P.C., by G. Grady Richardson, Jr. and Jennifer L. Carpenter, for plaintiffs-appellants.*

*Hodges Coxe & Potter, LLP, by C. Wes Hodges, II, for defendant-appellee.*

HAMPSON, Judge.

**Factual and Procedural Background**

Equity Trust Company Custodian for Benefit of Gordon Frieze IRA Traditional Account Number 113190 and Roth Account Number 113192 (Equity Trust) and Gordon P. Frieze, Jr. (Frieze) (collectively, Plaintiffs) appeal from an Order granting summary judgment in favor of S&R Grandview, LLC (Defendant) and from Orders setting aside entry of default and default judgment against Defendant. This appeal

arises out of a series of business transactions, questionable practices, internal and external business disputes, and multiple lawsuits involving the parties and others dating back to 2005. The result is a rather extensive and convoluted history of the case with all parties injecting accusations and innuendos into their arguments. Relevant, however, to this appeal, the Record tends to show the following:

Defendant is a North Carolina limited liability company (LLC) formed in 2005, whose sole purpose is to invest, own, hold, develop, and/or sell real estate—specifically, a residential subdivision in Pender County known as Eagle's Watch. According to Defendant's Bylaws, Defendant is a manager-managed LLC, and at the time of its organization, Defendant's two managers were Donald J. Rhine (Rhine) and Steven Silverman (Silverman). Defendant's Bylaws dictated any action taken on behalf of Defendant required both managers' approval. From its inception, Frieze and Maxine Ganer (Ganer) have been members of Defendant. Defendant's Bylaws also provided in the event Silverman ceased to act as manager, Ganer would serve as a manager in his place. In order to develop Eagle's Watch in 2005, Defendant first obtained a loan from Gramercy Warehouse Funding II LLC (Gramercy), and on or about 17 November 2006, Defendant secured a second loan of $11,000,000.00 from Cooperative Bank (Cooperative Bank Loan), which was in turn used to pay off the Gramercy loan. The Cooperative Bank Loan was personally guaranteed by, among others, Frieze, Ganer, Rhine, and Silverman.

On 22 November 2006, Defendant sold Lot 33R in Eagle's Watch for approximately $306,000.00 to Robert Russell Haywood, Carla Jean Haywood, Robert Whitty Haywood, and Deborah Harris Haywood (collectively, the Haywoods), who financed a portion of the purchase price via a loan from SunTrust Mortgage, Inc. (SunTrust) in the amount of $289,750.00. Plaintiffs' Complaint in this action (2014 Complaint) alleged the Haywoods subsequently became unwilling or unable to make payments on the loan to Suntrust. Thus, Plaintiffs alleged in early March 2008, to avoid allowing the Haywoods' Lot to go into foreclosure and to prevent any potential negative impact on the development, Defendant and the Frieze Enterprises, Inc. Defined Benefit Plan & Trust (Frieze Trust) entered into an agreement to purchase and resell Lot 33R (Lot 33R Agreement). The Lot 33R Agreement provided:

> Lot 33R was originally sold to [the Haywoods] at a critical time in the development stage. This sale[1] was influenced by [Defendant's] need to close with the Haywoods in order to assist in the loan to [Defendant] by Cooperative Bank. The Haywoods were unable to sustain their monthly payments and were extremely close to forfeiting their ownership back to [SunTrust]. Because [Defendant] did not want this blemish on the subdivision and felt it would blemish the banking relationship with Cooperative Bank, it was agreed upon with [sic] [Defendant] and [the Frieze Trust] would purchase and resell Lot 33R in Eagle's Watch. The terms of purchase and resell are as follows:
>
> 1.  [The Frieze Trust] will purchase Lot 33R at the exact cost of the lot to the Haywoods or $305,675.

---

[1] In his deposition, Frieze indicated that this referenced sale was the sale of Lot 33R from the Haywoods to the Frieze Trust.

2.     [The Frieze Trust] will list for sale in MLS and through the sales office at Eagle's Watch at a price agreed upon by Gordon Frieze, Don Rhine and Steve Silverman.

3.     [Defendant] shall reimburse [the Frieze Trust] for the difference between the purchase price of this Lot [33R], $305,675, and the net sales price.

4.     [The Frieze Trust] shall be reimbursed at an interest rate of 7% APR on the amount of the purchase price until lot is sold.

5.     Any loss and all interest due shall be paid to [the Frieze Trust] at closing on resale of lot.

The Lot 33R Agreement was purportedly signed by Frieze on behalf of the Frieze Trust, Rhine, and Silverman, although the Agreement contains no date of signature.[2] On 11 March 2008, Defendant obtained a second loan from Cooperative Bank for $500,000.00. In his deposition, Frieze acknowledged he drafted the Lot 33R Agreement and claimed it was necessary because Defendant had not yet obtained the second Cooperative Bank Loan and a foreclosure on the Haywoods' Lot 33R could jeopardize Defendant's relationship with Cooperative Bank and ability to obtain this second loan. On 12 March 2008, the Haywoods sold Lot 33R to the Frieze Trust[3] for $315,000.00, instead of the $305,675.00 price listed in the Lot 33R Agreement.

---

[2] The Record before us also contains two separate signature pages to the Lot 33R Agreement: one bearing the signatures of Frieze, Rhine, and Silverman; the other bearing plainly different signatures of Frieze and Rhine and unsigned by Silverman.

[3] The Record is silent on when the Frieze Trust subsequently transferred its interest in Lot 33R to Equity Trust.

In December of 2009, Silverman passed away, and under Defendant's Bylaws, Ganer became the other manager of Defendant and served in this role until July of 2014. According to Ganer, Silverman never mentioned the Lot 33R Agreement, and copies of this Agreement were not located in his business files after his death. Ganer claimed she first learned of the Lot 33R Agreement on 19 May 2010 when Frieze sent her an email informing her of the Agreement and providing her with a copy. In her affidavit, Ganer asserted:

> On numerous occasions during 2010, [Frieze] attempted to get me, as manager of [Defendant], to agree on a listing price for Lot 33R, as required by the [Lot 33R Agreement]. Due to my uncertainties regarding the legality and authenticity of the purported agreement, and the state of the real estate market at the time, I never agreed upon a price for Lot 33R.

On 20 December 2010, the Frieze Trust assigned its interest in the Lot 33R Agreement to Equity Trust. Although Defendant's managers never agreed on a list price in accordance with the Lot 33R Agreement, on 13 December 2010, Equity Trust listed Lot 33R for $79,900.00, and on 12 January 2011, Equity Trust and Pleasure Holdings, LLC[4] entered into a contract to sell and purchase Lot 33R for $78,000.00. According to their contract, Equity Trust agreed to seller finance $74,100.00 of the purchase price and to indemnify Pleasure Holdings, LLC against any claims or losses arising from any dispute between Frieze and Defendant. On 7 February 2011, a deed

---

[4] According to Frieze's deposition, Pleasure Holdings, LLC is owned by Bud Blanton, who Frieze has "had a relationship with for a long time in the real estate business[.]"

transferring Lot 33R to Pleasure Holdings, LLC was recorded. On 15 February 2011, Frieze emailed Rhine and Ganer requesting payment of $301,299.86 under the Lot 33R Agreement.

On 16 May 2011, at the request of his attorney, Frieze sent Ganer an email containing two documents related to the Lot 33R Agreement. The first document was a draft confession of judgment requesting Defendant "confess[] judgment in favor of Plaintiff in the sum of $302,171.07," the amount due under the Lot 33R Agreement. Notably, this draft confession of judgment contained a signature block for both Ganer and Rhine as the two managing members of Defendant. The second document was a draft complaint alleging Defendant breached the Lot 33R Agreement. According to her affidavit, Ganer informed Frieze and Rhine that she would not sign the confession of judgment.

The following day, 17 May 2011, Frieze signed a verification of the complaint (2011 Complaint). The same day, Rhine, purportedly on behalf of Defendant, signed a revised version of the confession of judgment (Confession of Judgment), which listed only Rhine as the managing member. On 19 May 2011, Plaintiffs filed the 2011 Complaint in New Hanover County (First Action). According to Plaintiffs, however, because they now had the Confession of Judgment signed by Rhine, Plaintiffs took a voluntary dismissal without prejudice, pursuant to Rule 41(a) of the North Carolina Rules of Civil Procedure, of the First Action on 23 May 2011 (First Voluntary

Dismissal). The next day, on 24 May 2011, Plaintiffs filed the Confession of Judgment, signed only by Rhine, in Pender County (Pender County Case) where Defendant's property was located. Attached to this filing was a civil action cover sheet listing the type of pleading as a "confession of judgment" and specifying the claim for relief was based on "contract."

On 22 June 2011, Ganer filed a Motion to Intervene and Motion for Relief from Judgment Pursuant to Rule 60 (2011 Motion for Relief) in the Pender County Case. In her Motion to Intervene, Ganer alleged the filing of the Confession of Judgment was contrary to Defendant's Bylaws—which required both managers' consent to bind Defendant—and therefore invalid and sought to intervene on behalf of Defendant in the Pender County Case. Ganer's 2011 Motion for Relief requested the trial court set aside the Confession of Judgment for the same reasons.

On 5 October 2011, the trial court entered an Order (Intervention Order) granting Ganer's Motion to Intervene, designating her as an "Intervenor Defendant to this action," and changing the "caption of this action" to reflect that Ganer was an Intervenor-Defendant. The Intervention Order also ordered that Ganer's 2011 Motion for Relief "shall constitute the initial pleading of the Intervenor Defendant[.]" The same day, the trial court entered an Order granting Ganer's 2011 Motion for Relief, setting aside the Confession of Judgment, and providing Defendant thirty days to answer Plaintiffs' Complaint in the First Action. On 16 November 2011, even

though Plaintiffs had already taken a voluntary dismissal of the First Action, Defendant filed its Answer to Plaintiffs' Complaint in the First Action.

While these first two cases between the parties were going on, Defendant was involved in a separate dispute with First Bank, the successor in interest to Cooperative Bank, over the two Cooperative Bank Loans, which had matured and become due in June of 2010. Sometime in February of 2011, First Bank filed a civil action against Defendant and the personal guarantors of the Cooperative Bank Loans (First Bank Suit), seeking recovery for Defendant's default. On 5 December 2011, First Bank, Defendant, and the individual guarantors participated in court-ordered mediation, and as a result, the parties executed a Settlement Agreement and Release (First Bank Settlement) in March of 2012. Pursuant to the First Bank Settlement, the individual guarantors, which included both Frieze and Ganer, were relieved of a significant portion of their liability under the Cooperative Bank Loans, and the First Bank Suit was dismissed. In addition, the First Bank Settlement required Frieze to dismiss the Pender County Case without prejudice. On 24 July 2012, Plaintiffs filed a voluntary dismissal without prejudice, again pursuant to Rule 41(a), of the Pender County Case (Second Voluntary Dismissal).

Also during this same time period, Ganer and Rhine were involved in several disputes over who had the authority to act on behalf of Defendant. In early 2012, Rhine filed a lawsuit against Ganer (Rhine-Ganer Action), contending he was the

only authorized manager of Defendant. On 29 February 2012, the trial court in the Rhine-Ganer Action entered a Temporary Restraining Order restraining Rhine from taking unilateral action on behalf of Defendant and from "refusing or failing to provide . . . Ganer or any member of Defendant . . . with information related to any and all legal proceedings pending against Defendant[.]" In defiance of this Order, Rhine would go on to file two more actions, including a foreclosure appeal and federal bankruptcy case, on behalf of Defendant, both of which were dismissed on the basis Rhine lacked authority to act alone on Defendant's behalf.

On 2 January 2014, Plaintiffs filed the 2014 Complaint alleging Defendant breached the Lot 33R Agreement. Because Rhine was listed as Defendant's registered agent with the Secretary of State, Plaintiffs mailed, by certified mail, the Summons and 2014 Complaint to Defendant's registered address, which was a P.O. Box owned by Rhine, and to Rhine's personal residence, which were received by Rhine on 3 and 13 January 2014, respectively.

On 5 February 2014, Matt Buckmiller (Buckmiller), counsel for Rhine individually, sent Plaintiffs' counsel an email regarding the present case, stating: "Give me a call when you get a chance about this lawsuit. I'd like to get an informal extension of time for 30 days so that we can figure out what lawyer is representing [Defendant], if any." The same day, Plaintiffs' counsel responded to Buckmiller, asking if an "informal extension until [3 March 2014 would] work[.]" Buckmiller

accepted Plaintiffs' counsel's informal extension by email the following day, and in this email, Buckmiller copied Joseph Gram (Gram), counsel for Ganer individually, on this email exchange. Five minutes after receiving this email, Gram sent Plaintiffs' counsel the following email: "I represent [Ganer] in the various [Defendant] related matters. I just saw the email chain between you and [Buckmiller] regarding [Plaintiffs'] lawsuit against [Defendant]. This is the first I have heard of the suit and would appreciate it if you would provide me with a courtesy copy." Thereafter, Plaintiffs' counsel provided Gram with a copy of the 2014 Complaint.

On 4 March 2014, in the present case, Plaintiffs filed a Motion for Entry of Default stating Defendant was served with the 2014 Complaint and "has failed to answer, otherwise respond or plead in a timely manner[.]" The same day, Plaintiffs filed a Motion for Default Judgment. Both Motions were served on Rhine as the registered agent of Defendant. On 7 March 2014, the clerk of court for New Hanover County Superior Court entered an Entry of Default and a Judgment (Default Judgment) in the amount of $368,113.36 against Defendant, with both documents again being served on Rhine only.

Also, during February and March 2014, Plaintiffs' counsel, Buckmiller, Trawick Stubbs (Stubbs)—another attorney for Rhine—Gram, and Gary Shipman (Shipman)—an attorney who had previously handled matters for Defendant— conferred about arranging a meeting to discuss various matters relating to

Defendant—such as the Rhine-Ganer Action, the present case, and another dispute with First Bank—and agreed to meet on 26 March 2014. On 19 March 2014, Gram emailed Plaintiffs' counsel to inquire into the status of the present case, and the following day, Plaintiffs' counsel informed Gram that "[w]e obtained an entry of default and default judgment against [Defendant]."

Thereafter, Plaintiffs began executing on the Default Judgment and had it transcribed to Pender County, where Defendant owned real property—specifically, forty acres of unencumbered land (40 Acres). On 29 April 2014, Plaintiffs filed a Motion "to fix procedural details of the execution sale of real property" owned by Defendant in Pender County, which was, again, only served on Rhine. On 8 May 2014, at an execution sale on the 40 Acres, Plaintiffs submitted the only bid, credit bidding the amount of the Default Judgment. On 19 May 2014, a third party apparently unrelated to the parties placed an upset bid on the 40 Acres. Another upset bid was submitted by a different business entity represented by Shipman on 29 May 2014. Although the Record is not clear, this sale was apparently not consummated.[5]

During this same time frame, Ganer and Rhine mediated the Rhine-Ganer Action, resulting in a Mediated Settlement Agreement entered on 16 May 2014 (Rhine-Ganer Settlement Agreement). The Rhine-Ganer Settlement Agreement

---

[5] The Record appears to indicate the prior upset bidder challenged the subsequent upset bid and sought an order requiring the property be put up for resale.

provided Defendant's members would appoint new managers for Defendant and that "Rhine agrees that Rebecca Rhine[, Rhine's wife,] and [Frieze] will not be the new managers." The Agreement also provided: "During the period of transition to the new managers, [Rhine] will not act unilaterally and must cooperate with [Ganer] consistent with the terms of the Temporary Restraining Order entered in this case." Further, the Agreement stated: "Rhine agrees that [Shipman] is authorized to represent [Defendant] . . . to address [Frieze's] claim and lawsuit against [Defendant] and prevent [Defendant] from losing its rights, title and interest to the 40 [A]cres."

On 28 May 2014, Defendant, through Shipman, filed a Motion for Relief from Judgment and to Set Aside Entry of Default (2014 Motion for Relief) arguing, *inter alia*, that Buckmiller's and Gram's communications with Plaintiffs' counsel in February and March 2014 constituted an "appearance" by Defendant, thereby prohibiting the Entry of Default, and that the Default Judgment itself was "void" because of Rule 41(a)'s "two-dismissal rule." By Orders entered on 18 July 2014, the trial court granted Defendant's 2014 Motion for Relief and set aside the Entry of Default (Order Setting Aside Entry of Default) and Default Judgment (Order Setting Aside Default Judgment). Thereafter, on 31 July 2014, Defendant filed its Answer to Plaintiffs' 2014 Complaint.

After extensive discovery, on 22 November 2017, Defendant filed a Motion for Summary Judgment arguing, *inter alia*, that Plaintiffs' 2014 Complaint violated the

two-dismissal rule. The trial court entered an Order granting Defendant's Motion (Summary Judgment Order) on 4 May 2018. The Summary Judgment Order concluded Plaintiffs' First Action and Pender County Case constituted "actions" for purposes of Rule 41(a) and thus Plaintiffs' two Voluntary Dismissals of these actions, which "[arose] out of the same transaction or occurrence and the same core operative facts[,]" triggered Rule 41(a)'s two-dismissal rule. Therefore, the trial court concluded the present action was barred. Plaintiffs timely filed Notice of Appeal from the trial court's Orders Setting Aside Entry of Default and Default Judgment and Summary Judgment Order.[6]

## Issues

The dispositive issues are (I) whether the trial court erred in applying the two-dismissal rule and granting summary judgment in favor of Defendant and (II) whether the trial court erred in setting aside the Entry of Default and Default Judgment.

## Standard of Review

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation and

---

[6] Defendant also filed timely Notice of Appeal from certain orders of the trial court; however, because our disposition renders Defendant's appeal moot, we do not reach Defendant's cross appeal.

quotation marks omitted). "A trial court's decision to grant or deny a motion to set aside an entry of default and default judgment is discretionary. Absent an abuse of that discretion, this Court will not reverse the trial court's ruling." *Basnight Constr. Co. v. Peters & White Constr. Co.*, 169 N.C. App. 619, 621, 610 S.E.2d 469, 470 (2005) (citations omitted).

## Analysis

### I. Two-Dismissal Rule

Plaintiffs argue the trial court erred in applying the two-dismissal rule for several reasons. First, Plaintiffs claim the Confession of Judgment is not an "action" for purposes of Rule 41 and thus the two-dismissal rule is inapplicable. Second, assuming Rule 41 applies, Plaintiffs argue its 2011 Complaint and the Confession of Judgment are not based upon the same transaction or occurrence. Plaintiffs also assert the Confession of Judgment was not "unilaterally dismissed by Plaintiff." Lastly, Plaintiffs contend Defendant should be estopped from asserting the two-dismissal rule.

Rule 41 of the North Carolina Rules of Civil Procedure provides:

> [A]n action or any claim therein may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before the plaintiff rests his case, or; (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that *a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of this or any*

*other state or of the United States, an action based on or including the same claim.*

N.C. Gen. Stat. § 1A-1, Rule 41(a)(1) (2017) (emphasis added). This provision of Rule 41(a)(1) is commonly referred to as the two-dismissal rule. Our Court has stated:

> [I]n enacting the two dismissal provision of Rule 41(a)(1), the legislature intended that a second dismissal of an action asserting claims based upon the same transaction or occurrence as a previously dismissed action would operate as an adjudication on the merits and bar a third action based upon the same set of facts.

*Richardson v. McCracken Enterprises*, 126 N.C. App. 506, 509, 485 S.E.2d 844, 846 (1997), *aff'd per curiam*, 347 N.C. 660, 496 S.E.2d 380 (1998). "The 'two dismissal' rule has two elements: (1) the plaintiff must have filed two notices to dismiss under Rule 41(a)(1) and (2) the second action must have been based on or included the same claim as the first action." *Dunton v. Ayscue*, 203 N.C. App. 356, 358, 690 S.E.2d 752, 753 (2010) (citation omitted). To analyze this second element, we look to whether the second action was based upon the same transaction or occurrence as the first action. *Richardson*, 126 N.C. App. at 509, 485 S.E.2d at 846.

> Our determination of whether claims are based upon the same transaction or occurrence require[s] us to assess (1) whether the issues of fact and law raised by the claim[s] . . . are largely the same; (2) whether substantially the same evidence bears on both claims; and (3) whether any logical relationship exists between the two claims.

*Gentry v. N.C. Dep't of Health & Human Servs.*, 242 N.C. App. 424, 427, 775 S.E.2d 878, 880 (2015) (alterations in original) (citation and quotation marks omitted).

Here, the parties agree the First Action, the filing of a civil complaint for breach of contract, constituted an "action" for purposes of the two-dismissal rule. *See* N.C. Gen. Stat. § 1-2 (2017) ("An action is an ordinary proceeding in a court of justice, by which a party prosecutes another party for the enforcement . . . of a right[.]"). Rather, Plaintiffs assert the Pender County Case is not an "action" under Rule 41 because it was instituted by the Confession of Judgment not a complaint. However, the Pender County Case viewed in its entirety falls within Rule 41's definition of an action.

Specifically, after Plaintiffs filed their Confession of Judgment in Pender County, Ganer filed her Motion to Intervene requesting to intervene on behalf of Defendant in the Pender County Case. *See* N.C. Gen. Stat. § 1A-1, Rule 24(a)-(b) (2017) (allowing "anyone . . . to intervene in an action" to protect their interests in the subject matter of the dispute). Ganer's 2011 Motion for Relief sought to have the Confession of Judgment set aside and for "Defendant [to] be permitted to file answer to the Complaint filed on behalf of Plaintiff[.]" The trial court entered its Intervention Order granting Ganer's Motion to Intervene, designating her as an "Intervenor Defendant to this action," and changing the "caption of this action" to reflect that she was an Intervenor-Defendant. The Intervention Order also ordered Ganer's 2011 Motion for Relief "shall constitute the initial pleading of the Intervenor Defendant[.]" The same day, the trial court entered its Order granting Ganer's 2011 Motion for

Relief, setting aside the Confession of Judgment, and providing Defendant thirty days to answer Plaintiffs' Complaint. Thereafter, Defendant filed its Answer to Plaintiffs' Complaint in the First Action. Plaintiffs, themselves, then voluntarily dismissed this action when they filed their Second Voluntary Dismissal on 24 July 2012. On these facts, after the trial court's Intervention Order and Order granting Ganer's 2011 Motion for Relief, the Pender County Case constituted an "action" for purposes of Rule 41.

Plaintiffs next contend the Confession of Judgment is not based upon the same transaction or occurrence as the First Action. Specifically, Plaintiffs assert the Confession of Judgment and the First Action are not based upon the same transaction or occurrence because the First Action involved a claim for breach of contract, whereas Plaintiffs claim the Confession of Judgment simply sought entry of a monetary judgment against Defendant. However, as our Court has made clear, the focus of whether claims are based on the same transaction or occurrence is on "(1) whether the issues of fact and law raised by the claim[s] . . . are largely the same; (2) whether substantially the same evidence bears on both claims; and (3) whether any logical relationship exists between the two claims." *Gentry*, 242 N.C. App. at 427, 775 S.E.2d at 880 (alterations in original) (citation and quotation marks omitted).

Here, the First Action was for breach of contract against Defendant based on the Lot 33R Agreement, and the Pender County Case was for entry of a judgment

against Defendant based on the Lot 33R Agreement. The present case, again, raises a claim against Defendant for monies owed arising under the Lot 33R Agreement. In the First Action, the "issues of fact and law" included whether the Lot 33R Agreement was valid and whether Defendant breached the Agreement. The Pender County Case dealt with the exact same issues of fact and law once Ganer was permitted to intervene. Further, both the First Action and Pender County Case would require identical evidence for either party to prevail, and a clear "logical relationship exists between" the two—namely, both sought the same relief: recovery of the exact debt Plaintiffs allegedly were due under the Lot 33R Agreement. *Id.* (citation and quotation marks omitted). Therefore, the First Action and Pender County Case plainly "are based upon the same transaction or occurrence[.]" *Id.* (citation omitted). The present action seeks the same relief[7] and would thus be barred by the two prior Voluntary Dismissals.

Further, attacking the first prong of the two-dismissal rule, Plaintiffs also argue the Confession of Judgment was not "unilaterally dismissed by Plaintiff," claiming Defendant "stipulated" to the Second Voluntary Dismissal in the First Bank Settlement. However, "[t]he crucial element in a notice of dismissal is the intention

---

[7] This is what distinguishes this case from *Lifestore Bank v. Mingo Tribal Preservation Trust,* 235 N.C. App. 573, 763 S.E.2d 6 (2014), relied on heavily by Plaintiffs. There, while the first two actions dismissed were foreclosures by power of sale before the clerk, the third action sought different relief: judicial foreclosure and a money judgment. *See In re Foreclosure of Herndon*, 245 N.C. App. 83, 90, 781 S.E.2d 524, 528 (2016) (citation omitted).

of the party actually to dismiss the case." *Robinson v. General Mills Restaurant*, 110 N.C. App. 633, 636, 430 S.E.2d 696, 698 (1993) (citation omitted).  Here, the Second Voluntary Dismissal plainly and unequivocally states: "Please take notice that Plaintiff hereby voluntarily dismisses this action pursuant to Rule 41 of the North Carolina Rules of Civil Procedure, <u>without</u> prejudice."  Plaintiffs' Second Voluntary Dismissal evinces an "intention of the party actually to dismiss the case." *Id.* (citation omitted).  Therefore, Plaintiffs (1) "filed two notices to dismiss under Rule 41(a)(1)[,]" and (2) as discussed above, the Pender County Case was "based on . . . the same claim" as the First Action, thereby satisfying both elements of the two-dismissal rule. *Dunton*, 203 N.C. App. at 358, 690 S.E.2d at 753 (citation omitted).

In a similar vein, Plaintiffs argue Defendant should be estopped from asserting the two-dismissal rule because Plaintiffs relied on Defendant's Confession of Judgment in obtaining a dismissal of the First Action and because Defendant benefited under the First Bank Settlement, which required Plaintiffs to dismiss the Pender County Case.  We disagree.

"Equitable estoppel arises when one party, by his acts, representations, or silence when he should speak, intentionally, or through culpable negligence, induces a person to believe certain facts exist, and that person reasonably relies on and acts on those beliefs to his detriment." *Gore v. Myrtle/Mueller*, 362 N.C. 27, 33, 653 S.E.2d 400, 405 (2007) (citation omitted).  Our Supreme Court has stated: "One who seeks

equity must do equity. The fundamental maxim, [h]e who comes into equity must come with clean hands, is a well-established foundation principle upon which the equity powers of the courts of North Carolina rest." *Creech v. Melnik*, 347 N.C. 520, 529, 495 S.E.2d 907, 913 (1998) (citations and quotation marks omitted).

Here, the Record establishes Plaintiffs are not entitled to equitable relief on the basis of their own unclean hands. For instance, Frieze conceded he never obtained Ganer's consent for the listing and purchase price of Lot 33R in contravention of the Lot 33R Agreement. Frieze also sold Lot 33R at a reduced price to Pleasure Holdings, LLC, a company owned by his friend and business associate, who he agreed to indemnify if Defendant contested this purchase. With regard to the Confession of Judgment itself, on 16 May 2011, three days before filing the First Action, Frieze sent Ganer the draft confession of judgment containing a signature block for Ganer as one of the managers of Defendant; however, on 24 May 2011, Frieze filed the Confession of Judgment signed only by Rhine. The filing of the Confession of Judgment represented a deliberate attempt by Frieze to circumvent Defendant's Bylaws by not obtaining Ganer's approval. Thereafter, Ganer filed her Motion to Intervene and 2011 Motion for Relief and was allowed to intervene in the Pender County Case and to set aside the Confession of Judgment.

Further, in filing the present case, Plaintiffs' actions illustrate a continuing pattern of a lack of clean hands. Although multiple court orders prohibited Rhine

from acting unilaterally on Defendant's behalf, a fact Frieze was surely well aware of as a member of Defendant, Plaintiffs repeatedly served all court documents in this case solely on Rhine. Although Plaintiffs technically complied with Rule 4's service requirements, Plaintiffs' actions in this respect—when coupled with the fact that Plaintiffs' counsel, without notice, sought and obtained the Entry of Default and Default Judgment[8] while in discussions with Gram, Buckmiller, and Shipman over, *inter alia,* how to proceed in the present case—cut against exercising equitable remedies. *See id.* Therefore, the trial court did not err in applying the two-dismissal rule and granting summary judgment for Defendant. Accordingly, we affirm the trial court's Summary Judgment Order.

## II. Entry of Default and Default Judgment

Plaintiffs further contend the trial court erred by setting aside the Entry of Default and Default Judgment. Under Rule 55(b)(1) of our Rules of Civil Procedure, the clerk of superior court may enter a default judgment against a defendant only if the defendant has never made an appearance in the action. *N.C.N.B. v. McKee*, 63 N.C. App. 58, 60, 303 S.E.2d 842, 844 (1983) (citation omitted); *see* N.C. Gen. Stat. § 1A-1, Rule 55(b)(1) (2017). "Generally, an appearance requires some presentation or submission to the court." *Cabe v. Worley*, 140 N.C. App. 250, 253, 536 S.E.2d 328, 330 (2000) (citation and quotation marks omitted). Nevertheless, "a defendant does

---

[8] Even initiating an execution sale, at which Plaintiffs attempted to purchase the 40 Acres.

not have to respond directly to a complaint in order for his actions to constitute an appearance." *Roland v. Motor Lines*, 32 N.C. App. 288, 289, 231 S.E.2d 685, 687 (1977) (citation omitted). Rather, "an appearance may arise by implication when a defendant takes, seeks, or agrees to some step in the proceedings that is beneficial to himself or detrimental to the plaintiff." *Id.* (citations omitted); *see Coastal Fed. Credit Union v. Falls*, 217 N.C. App. 100, 103-07, 718 S.E.2d 192, 194-96 (2011) (concluding the defendants' negotiations with the plaintiff's law firm regarding a payment plan could qualify as an "appearance," thereby entitling the defendants to notice of the default judgment hearing); *Webb v. James*, 46 N.C. App. 551, 557, 265 S.E.2d 642, 646 (1980) (holding "when [a] defendant negotiated a continuance of the action . . . , that he made an appearance"). In *Lexis-Nexis v. Travishan Corp.*, our Court recognized when an agent of a defendant corporation negotiates with the opposing party, the agent can "make an implied appearance on behalf of [the] corporation[.]" 155 N.C. App. 205, 208, 573 S.E.2d 547, 549 (2002). This is so because "[a] corporation can only act through its agents." *Id.* (alteration in original) (citation and quotation marks omitted).

Here, when the clerk entered its Entry of Default and Default Judgment, Defendant had appeared within the meaning of Rule 55. Prior to filing its Motions for Entry of Default and Default Judgment, Buckmiller, counsel for Rhine individually, sent Plaintiffs' counsel an email regarding the 2014 Complaint, stating:

"Give me a call when you get a chance about this lawsuit. I'd like to get an informal extension of time for 30 days so that we can figure out what lawyer is representing [Defendant], if any." Thereafter, Plaintiffs' counsel offered Buckmiller an "informal extension until [3 March 2014,]" which Buckmiller accepted. As Rhine was one of the managers of Defendant at this time, and its registered agent, Rhine's acceptance of Plaintiffs' offering of an informal extension of time constituted "an implied appearance on behalf of [Defendant.]" *Id.* In addition, after being granted an informal extension of time, Frieze's counsel continued having discussions with Buckmiller, Gram, and Shipman about arranging a meeting to discuss the various matters relating to Defendant, including the present case, which such discussions further suggest Defendant had made an appearance. *See Falls*, 217 N.C. App. at 103-07, 718 S.E.2d at 194-96. Therefore, because Defendant had appeared in this action, the clerk's Entry of Default and Default Judgment were "void." *McKee*, 63 N.C. App. at 61, 303 S.E.2d at 844 (citation omitted). Thus, under Rule 60(b), the trial court did not abuse its discretion in setting aside the Entry of Default and Default Judgment. *See* N.C. Gen. Stat. § 1A-1, Rule 60(b)(4) (2017) (allowing a trial court to set aside a default judgment where "[t]he judgment is void").

## Conclusion

Accordingly, for the foregoing reasons, we affirm the trial court's Orders Setting Aside Entry of Default and Default Judgment and Summary Judgment Order.

AFFIRMED.

Judges STROUD and BROOK concur.